**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **JOHN W. TISDALE, JR., et al.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:17-cv-00613-WKW-DAB** |
| | ) | |
| **THE CITY OF ANDALUSIA,** | ) | |
| **ALABAMA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

The City of Andalusia, Alabama, submits this Memorandum in support

of its motion to dismiss or, in the alternative, for summary judgment.  (Doc. 2.)

1

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................... 4

II. STATEMENT OF THE FACTS ...................................... 4

   A.   The First Four Abatements ..................................... 4

   B.   The Pear Street Property ...................................... 13

   C.   The Mediation Settlement Agreement ...................... 22

   D.   The City's Response to Specific Allegations ............. 35

III. ANALYSIS .............................................................. 46

   A.   The Subject Matter Jurisdiction Standard................. 46

   B.   The Failure-to-State-a-Claim Standard .................... 47

   C.   The Court May Consider Most of the Exhibits Without Applying the Summary Judgment Standard ..................................... 50

   D.   The Summary Judgment Standard .......................... 53

   E.   Analysis of the Claims ........................................ 54

      1.   The City is Entitled to Judgment as a Matter of Law on the Fourth Amendment Claim .......................................................... 55

      2.   The City is Entitled to Judgment as a Matter of Law on the Fifth Amendment Equal Protection Claim ........................................ 65

      3.   The City is Entitled to Judgment as a Matter of Law on the Fourteenth Amendment Equal Protection Claim .................................... 66

      4.   The City is Entitled to Judgment as a Matter of Law on the Breach of Contract Claim ................................................................. 79

      5.   The City is Entitled to Judgment as a Matter of Law on the RICO Claim............................................................................. 80

      6.   The City is Entitled to Judgment as a Matter of Law on the RICO Claim for Treble Damages ..................................................... 84

      7.   The City is Entitled to Judgment as a Matter of Law on the Civil Conspiracy Claim .............................................................. 84

      8.   The Doctrine of Res Judicata, or Claim Preclusion, Bars Most of the Tisdales' Claims ............................................................... 86

      9.   The Tisdales Have Released Most of Their Claims........................... 87

      10.   The Tisdales Waived the Right to Bring this Action in a Covenant Not to Sue and Limitation of Remedy Clause ................................. 89

      11.   The Court Should Dismiss the Punitive Damages Claim Based Upon Immunity........................................................................... 90

      12.   The Court Lacks Subject Matter Jurisdiction Over the Tisdales' Request for Injunctive Relief.................................................... 91

IV.  CONCLUSION ............................................................................................... 93

STATEMENT OF THE TISDALES' POSITION .................................................. 93

## I.  INTRODUCTION

This lawsuit arose from the Tisdales' breach of a mediation settlement agreement and their refusal to remediate their dilapidated properties.  The Amended Complaint asserts claims that the Tisdales have released, claims that are barred by *res judicata*, and claims the Tisdales contracted never to bring. The Amended Complaint's factual allegations are inaccurate.  None of the counts states a claim upon which relief can be granted.  The Court lacks subject matter jurisdiction over any request for injunctive relief.  This Memorandum explains why the Court should dismiss this action with prejudice or, in the alternative, grant summary judgment for the City.

## II.  STATEMENT OF THE FACTS

The Tisdales own several properties in the City of Andalusia.  (Doc. 2 at 3, ¶ 10.)  This lawsuit relates to the City's efforts to abate five of those properties.  (Doc. 2 at 3, ¶ 10.)

## A.    The First Four Abatements

The City's abatement efforts began with four properties:

1.  The property at 233 South Cotton Street;

2.  The lot adjacent to 233 South Cotton Street;

3.  The property at 201 South Three Notch Street; and

4.  The property at 254 Historic Central Street.

(Doc. 2 at 4, ¶ 13; Doc. 17-5; Doc. 17-6; Doc. 17-7; Doc. 17-8; Doc. 17-9; Doc. 17-10; Doc. 17-11.)

The City has filed certified copies of the deeds for these properties.  (Doc. 17-23; Doc. 17-24; Doc. 17-25; Doc. 17-26.)  The property at 233 South Cotton Street has been owned by John Tisdale since June 26, 1990.  (Doc. 17-23.)  The lot adjacent to 233 South Cotton Street has been owned by John W. Tisdale, Jr. and Jennifer H. Tisdale since July 31, 1991.  (Doc. 17-24.)  The properties at 201 South Three Notch Street and 254 Historic Central Street have been owned by Tisdale Family Properties, Inc. since March 26, 1999. (Doc. 17-24; Doc. 17-25.)  Mr. Tisdale is the president of Tisdale Family Properties, Inc.  (Doc. 8-2 at 2, ¶ 3.)

The selection of properties for abatement is made by employees in the City's Planning and Development Department.  (Doc. 22-1 at 17, ¶ 41.) Andalusia Mayor Earl Johnson played no role in selecting the properties at issue in this case.  (Doc. 22-1 at 17, ¶ 41.)

Between October 28-30, 2015, city building inspector Richard Moore documented the condition of each property.  (Doc. 22-1 at 1-2, ¶¶ 2, 4.) Exhibits 1, 2, 3 and 4 are photos from the October 28-30, 2015 time period. (Doc. 22-1 at 1-4, ¶ 5; Doc. 17-1; Doc. 17-2; Doc. 17-3; Doc. 17-4.)



Doc. 17-1 - 233 South Cotton Street (taken October 29, 2015)



Doc. 17-2 - Lot Adjacent to 233 South Cotton Street (taken October 30, 2015)



Doc. 17-3 - 201 South Three Notch Street (taken October 28, 2015)



Doc. 17-4 - 254 Historic Central Street (taken October 29, 2015)

On November 18, 2015, officials in the City's Planning and Development Department mailed courtesy letters to the owners of record (the Tisdales) asking them to remediate the properties voluntarily. (Doc. 22-1 at 5, ¶ 6.) Exhibits 5, 6, 7, 8, 9, 10, and 11 are copies of those letters. (Doc. 22-1 at 5, ¶ 6; Doc. 17-5; Doc. 17-6; Doc. 17-7; Doc. 17-8; Doc. 17-9; Doc. 17-10; Doc. 17-11.)

The Tisdales failed to remediate the properties, and on December 21, 2015, the City issued Findings of Public Nuisance, Notices and Orders to Remedy, and Notices of *Lis Pendens* declaring each property a public nuisance and listing the reasons for that finding. (Doc. 22-1 at 5, ¶ 7.) Exhibits 12, 13, 14, and 15 are copies of the Findings of Public Nuisance, Notices and Orders to Remedy, and Notices of *Lis Pendens*. (Doc. 22-1 at 5, ¶ 7; Doc. 17-12; Doc. 17-13; Doc. 17-14; Doc. 17-15.)

The Findings of Public Nuisance, Notices and Orders to Remedy, and Notices of *Lis Pendens* invoked the City's ordinance number 2015-03, (Doc. 17-12 at 1; Doc. 17-13 at 1; Doc. 17-14 at 1; Doc. 17-15 at 1), which is titled "An Ordinance Concerning Unsafe Structures and Dangerous Buildings," (Doc. 2-2 at 1; Doc. 17-38 at 2). Exhibit 38 is a certified copy of the ordinance. (Doc. 17-38.)

The Findings of Public Nuisance, Notices and Orders to Remedy, and Notices of *Lis Pendens* specified each property's defects. (Doc. 17-12 at 4-5, ¶ 4(a)-(m); Doc. 17-13 at 5-7, ¶ 4(a)-(k); Doc. 17-14 at 4-5, ¶ 4(a)-(j); Doc. 17-15 at 4-6, ¶ 4(a)-(n).) The Findings of Public Nuisance, Notices and Orders to

8

Remedy, and Notices of *Lis Pendens* identified the date, time, and location that the city council would hold public hearings for each property.  (Doc. 17-12 at 7-8, ¶ 11; Doc. 17-13 at 8-9, ¶ 11; Doc. 17-14 at 6-7, ¶ 10; Doc. 17-15 at 7-8, ¶ 11.)  Specifically, the Findings of Public Nuisance, Notices and Orders to Remedy, and Notices of *Lis Pendens* stated that the council would hold the public hearings "in the Council Chambers at the City of Andalusia City Hall, 505 East Three Notch Street, Andalusia, Alabama, on the 16th day of February, 2016, at 6:00 p.m."  (Doc. 17-12 at 7, ¶ 11; Doc. 17-13 at 8, ¶ 11; Doc. 17-14 at 6, ¶ 10; Doc. 17-15 at 7, ¶ 11.)  The Findings of Public Nuisance, Notices and Orders to Remedy, and Notices of *Lis Pendens* also advised the Tisdales of their right to appeal the council's decision to the Covington County circuit court.  (Doc. 17-12 at 7-8, ¶ 11; Doc. 17-13 at 8, ¶ 11; Doc. 17-14 at 7, ¶ 10; Doc. 17-15 at 8, ¶ 11.)  The City served the Findings of Public Nuisance, Notices and Orders to Remedy, and Notices of *Lis Pendens* upon each property's owner of record.  (Doc. 17-12 at 11-13; Doc. 17-13 at 13-15; Doc. 17-14 at 11-13; Doc. 17-15 at 12-14.)  The City also published notice of the hearings in the *Andalusia Star* newspaper.  (Doc. 22-1 at 5, ¶ 9.)

On February 16, 2016, the city council conducted separate public hearings for each property.  (Doc. 22-1 at 5, ¶ 10.)  Exhibit 39 is a certified copy of the minutes.  (Doc. 17-39.)  After the council conducted hearings for the abatements of other peoples' properties at 220 Crescent Street, 222 Crescent Street, and 101 South Cotton Street, the council conducted its hearings on the Tisdales' properties.  (Doc. 17-39 at 4-9.)

9

At each hearing, the City's director of Planning and Development and a consultant presented a Finding of Public Nuisance, Notice and Order to Remedy, and Notice of Lis Pendens, post-publication affidavit of legal notice in the *Andalusia Star* newspaper, proof of publication, and a detailed written report, including photographs.  (Doc. 17-39 at 9, 11, 13, 14.)  Mr. Tisdale appeared at each hearing and addressed the council.  (Doc. 22-1 at 5, ¶ 10; Doc. 17-39 at 11, 12, 14, 16.)  After each hearing, the council voted unanimously to declare each property a public nuisance and to proceed with the abatement, with the exception of the property at 233 South Cotton Street. (Doc. 22-1 at 5-6, ¶ 10; Doc. 17-39 at 11, 13, 14, 16.)  For the property at 233 South Cotton Street, the council continued the public hearing until March 1, 2016, to allow Mr. Tisdale time to propose a remediation agreement to officials in the City's Planning and Development Department.  (Doc. 22-1 at 6, ¶ 10; Doc. 17-39 at 16.)

Mr. Tisdale failed to propose a suitable agreement to the Planning and Development Department officials.  (Doc. 22-1 at 6, ¶ 11.)  On March 1, 2016, the council reconvened its public hearing regarding the property at 233 South Cotton Street.  (Doc. 22-1 at 6, ¶ 11.)  Exhibit 40 is a certified copy of the minutes.  (Doc. 17-40.)  The council voted unanimously to declare the property at 233 South Cotton Street a public nuisance and to proceed with the abatement, but allowed Mr. Tisdale until May 30, 2016, to take the remedial measures identified in the notice of *lis pendens* for that property.  (Doc. 22-1 at 6, ¶ 11; Doc. 17-40 at 3, 5.)  In other words, the council granted Mr. Tisdale an

additional ninety days to remediate the property at 233 South Cotton Street. (Doc. 22-1 at 6, ¶ 11; Doc. 17-40 at 3.)

Section 5-107(c) of the Ordinance Concerning Unsafe Structures and Dangerous Buildings provided the Tisdales a right to appeal the council's decisions:

> Any person aggrieved by the decision of the Council at the hearing may, within ten (10) days thereafter, appeal to the Circuit Court of Covington County, Alabama, upon filing with the clerk of the Circuit Court of Covington County, Alabama, notice of the appeal and bond for security of costs in the form and amount to be approved by the Circuit Clerk.

(Doc. 2-2 at 11; Doc. 17-38 at 12.)  The Tisdales did not exercise their right to appeal any of the abatement decisions to the Covington County circuit court. (Doc. 22-1 at 6, ¶ 12.)

On April 29, 2016, the City served Tisdale Family Properties, Inc. notice of its intent to demolish the property located at 254 Historic Central Street. (Doc. 17-19; Doc. 22-1 at 6, ¶ 13.)  On April 29, 2016, the City served Tisdale Family Properties, Inc. notice of its intent to repair the property located at 201 South Three Notch Street.  (Doc. 17-18; Doc. 22-1 at 6, ¶ 13.)  On April 29, 2016, the City served Mr. Tisdale notice of its intent to repair the property located at 233 South Cotton Street.  (Doc. 17-16; Doc. 22-1 at 6-7, ¶ 13.)  On April 30, 2016, the City served Mr. Tisdale and Jennifer H. Tisdale notice of its intent to demolish the property adjacent to 233 South Cotton Street.  (Doc. 17-17; Doc. 22-1 at 7, ¶ 13.)  With regard to the property at 233 South Cotton Street, the City stipulated that it would not proceed with the abatement until

11

May 30, 2016, so as to allow Mr. Tisdale the additional ninety days to remediate the property, (Doc. 17-16 at 2, 6; Doc. 22-1 at 7, ¶ 13).

Although the ninety-day extension technically applied only to the property at 233 South Cotton Street, the City withheld action to allow the Tisdales the additional ninety days on all four properties.  (Doc. 22-1 at 7, ¶ 14.)  The Tisdales were aware of this informal extension.  (Doc. 17-27 at 3, ¶ 13.)

Instead of remediating the properties, however, on May 27, 2016, the Tisdales filed a lawsuit in federal court and obtained an *ex parte* temporary restraining order blocking the City from taking abatement action.  (Doc. 17-27; Doc. 2-5; Doc. 22-1 at 7, ¶ 15.)  In their federal court complaint, the Tisdales asserted equal protection claims under the Fifth and Fourteenth Amendments to the U.S. Constitution.  (Doc. 17-27 at 7-9, ¶¶ 19-28.)  Although this Court initially granted an *ex parte* temporary restraining order, (Doc. 8-1 at 2-4), that order expired on August 26, 2016, (Doc. 2-7 at 1).

Instead of immediately proceeding with the abatements, however, the City again tried to resolve its concerns with the Tisdales through negotiation.  (Doc. 8-2 at 64, ¶ 3, last sentence; Doc. 17-34 at 21, ¶ 4.)  Magistrate Judge Susan Russ Walker conducted a mediation for the parties on December 19, 2016.  (Doc. 17-28.)  As a result of the mediation, the Tisdales and the City executed a mediation settlement agreement and release of all claims ("the mediation settlement agreement").  (Doc. 2-9.)

**B.      The Pear Street Property**

While the federal court action involving the first four properties was pending, the City learned that a building at 101 Pear Street posed an imminent danger to the public.  (Doc. 17-31; Doc. 22-1 at 17, ¶ 39.)  Since March 26, 1999, the property at 101 Pear Street has been owned by Tisdale Family Properties, Inc.   (Doc. 17-32.)   In August 2016, the Tisdales' structural engineer, Bradley B. Johnson, inspected the building at 101 Pear Street.  (Doc. 17-43 at 2.)  On August 10, 2016, Mr. Johnson reported his findings to Mr. Tisdale in a letter.  (Doc. 17-34 at 4-5; Doc. 17-43.)  Mr. Johnson found that "the roof and floors on approximately the northern one-third of the building ha[d] been demolished, along with a wood framed bay window that existed on the east wall of the building at the third floor level."  (Doc. 17-34 at 4; Doc. 17-43 at 2.)  Mr. Johnson warned that "[t]he removal of the wood framed floor and roof systems from the northern portion of the building ha[d] rendered the remaining exterior walls at these locations structurally unstable against lateral loads (wind loads)."  (Doc. 17-34 at 4; Doc. 17-43 at 2.)  Mr. Johnson advised that "the existing brick masonry walls of the building in the area where the roof and floors were removed should be immediately braced in order to be made structurally stable."  (Doc. 17-34 at 4; Doc. 17-43 at 2.)

The Tisdales' attorney at that time, Adam Jones, provided a copy of Mr. Johnson's letter to the City's legal counsel.  (Doc. 22-1 at 17, ¶ 39.)  The City's counsel forwarded the letter to City officials.  (Doc. 22-1 at 17, ¶ 39.)  The letter alerted City officials that the building at 101 Pear Street was structurally

unstable against wind loads.  (Doc. 22-1 at 17, ¶ 39; Doc. 17-34 at 4; Doc. 17-43 at 2, ¶ 4.)  The City unsuccessfully attempted to negotiate a resolution with the Tisdales.  (Doc. 22-1 at 17, ¶ 39; Doc. 8-2 at 64, ¶ 3, last sentence; Doc. 17-34 at 21, ¶ 4, first sentence.)

After negotiations failed, the City initiated the abatement process.  (Doc. 22-1 at 17, ¶ 39.)  On September 1, 2016, the City issued a Finding of Public Nuisance, Notice of Declaration of Emergency, and Notice of *Lis Pendens* regarding the 101 Pear Street building.  (Doc. 17-31; Doc. 17-34 at 6-13.)  The Finding of Public Nuisance, Notice of Declaration of Emergency, and Notice of *Lis Pendens* explained that an imminent danger existed in the form of "unstable exterior masonry walls."  (Doc. 17-31 at 2; Doc. 17-34 at 6.)  This finding was based upon the opinion of the Tisdales' own structural engineer. (Doc. 17-34 at 4-5; Doc. 17-43 at 2; Doc. 22-1 at 17, ¶ 39.)

The Finding of Public Nuisance, Notice of Declaration of Emergency, and Notice of *Lis Pendens* announced a public hearing "on the 6th day of September, 2016, at 6:00pm in the Council Chambers at the City of Andalusia City Hall, 505 East Three Notch Street, Andalusia, Alabama."  (Doc. 17-31 at 2-3; Doc. 7-34 at 7-8.)   The City served the Finding of Public Nuisance, Notice of Declaration of Emergency, and Notice of *Lis Pendens* upon Tisdale Family Properties, Inc. on September 1, 2016.  (Doc. 17-34 at 12.)  The City also advertised the public hearing in the *Andalusia Star* newspaper.  (Doc. 17-34 at 14.)

Exhibit 41 is a certified copy of the minutes for the September 6, 2016 hearing.  (Doc. 17-41.)   During the hearing, Mr. Tisdale appeared with his structural engineer, Mr. Johnson.    (Doc. 17-41 at 3-4.)    Mr. Johnson "confirmed that the exterior walls of the building at 101 Pear Street are structurally unstable against lateral loads (wind loads), and he believed that these walls had been structurally unstable since the removal of the roof and floors from the building.  The walls could fall anytime that wind puts a load on the walls." (Doc. 17-41 at 4.)  Mr. Johnson told the council that steel bracing could be installed within two weeks.  (Doc. 17-41 at 4.)  Mr. Tisdale promised the council that he would complete the repairs that Mr. Johnson suggested within two weeks. (Doc. 17-41 at 4.)  The council voted to abate the property, but to delay demolition by two weeks to allow Tisdale Family Properties, Inc. an opportunity to bring the property into compliance.  (Doc. 17-34 at 22, ¶ 2; Doc. 17-41 at 4.)  The council also ordered the closure of portions of two city streets adjoining the property "until it is safe for the public to travel on them again." (Doc. 17-41 at 4.)

At its September 20, 2016 meeting, the city council voted to grant Tisdale Family Properties, Inc. an additional seven-day extension to make the repairs at 101 Pear Street.  (Doc. 17-34 at 23, ¶ 1; Doc. 17-42 at 3.)  Exhibit 42 is a certified copy of the minutes for that meeting.  (Doc. 17-42.)

Instead of making the repairs, on September 27, 2016, Mr.  Tisdale filed a motion requesting this Court include the property at 101 Pear Street in the

temporary restraining order in case number 2:16-cv-00387-WKW-SRW.[1]  (Doc. 17-33.)  Bizarrely, Mr. Tisdale attached to his motion four letters that actually proved the building's dangerous condition.  (Doc. 17-34 at 2-5, 15-20.)

First, a letter dated June 27, 2012, from structural engineer Danny P. Raines documented "the extreme state of deterioration of the timber roof and 2nd and 3rd floors" of the building at 101 Pear Street.  (Doc. 17-34 at 2.)  According to Mr. Raines's letter, "[t]he north approximately one-third of the roof framing of the building ha[d] collapsed."  (Doc. 17-34 at 3.)  "The parapet wall on the east side of the structure near the north end appear[ed] to be damaged and deteriorated."  (Doc. 17-34 at 3.)  "The exterior load bearing clay masonry walls of the building [were] exhibiting moderate deterioration with some areas exhibiting extensive deterioration."  (Doc. 17-34 at 3.)  Mr. Raines opined that "the timber framing of the subject building is in very poor condition and should be removed to prevent damage to the exterior load bearing walls."  (Doc. 17-34 at 3.)  Mr. Raines further recommended that "[a]s the framing is removed, temporary shoring or permanent bracing should be installed to replace the bracing that was provided by the roof and 2nd floor framing."  (Doc. 17-34 at 3.)  Mr. Raines warned that "[t]he damaged parapet located on the east wall near the north end could present a falling debris hazard for pedestrians and should be removed or repaired immediately."  (Doc. 17-34 at 3.)

Second, Mr. Tisdale filed structural engineer Bradley B. Johnson's letter dated August 10, 2016, in which Mr. Johnson reported that the building's

---

[1] Mr. Tisdale filed the motion in his individual capacity, (Ex. 33), even though he did not actually own the property at 101 Pear Street, (Ex. 32).

16

exterior walls were "structurally unstable against lateral loads (wind loads)." (Doc. 17-34 at 4, ¶ 4.)  Despite Mr. Johnson's call for immediate bracing, the exterior masonry walls remained unstable when the City issued its Finding of Public Nuisance, Notice of Declaration of Emergency, and Notice of *Lis Pendens* on September 1, 2016.  (Doc. 17-31 at 2; Doc. 17-31 at 8, ¶ 2.)

Third, Mr. Tisdale filed a letter from his own attorney dated September 6, 2016, in which Mr. Tisdale's attorney acknowledged that the property had been in that condition "for many months."  (Doc. 17-34 at 15, ¶ 3.)

Fourth, Mr. Tisdale filed a letter from an engineer named David C. Jones dated September 13, 2016, in which Mr. Jones found that "[t]he previous wood-framed floor and roof systems of the three-story structure had been removed." (Doc. 17-34 at 17.)  Mr. Jones determined that "with the floor and roof framing systems removed, the three perimeter walls of the northern portion of the structure are not laterally braced."  (Doc. 17-34 at 17.)   Mr. Jones warned that "the natural stability of these components would not likely be able to successfully resist wind pressures associated with a severe windstorm or hurricane without structural damage or collapse."  (Doc. 17-34 at 18.)

Mr. Jones also expressed an "immediate structural concern" for the "unsupported edge conditions of the third floor walls at the center of the east elevation of the structure where a bay window [had] previously been removed." (Doc. 17-34 at 18.)   Mr. Jones warned that "[n]o continuity of the wall construction exists as the head over the bay window opening is also missing,

leaving the northern and southern portions of the wall unsupported and further reducing the strength/rigidity of the multi-wythe brick walls either side of the vacant window opening." (Doc. 17-34 at 18.)

On the same day that Mr. Tisdale filed his motion to include 101 Pear Street in this Court's temporary restraining order, the City documented the building's condition with the photographs identified as Exhibits 21 and 22. (Doc. 22-1 at 15-17, ¶ 38; Doc. 17-21; Doc. 17-22.)  The photos illustrate Mr. Johnson's observations that "the roof and floors on approximately the northern one-third of the building ha[d] been demolished, along with a wood framed bay window that existed on the east wall of the building at the third floor level," and "[t]he removal of the wood framed floor and roof systems from the northern portion of the building ha[d] rendered the remaining exterior walls at these locations structurally unstable against lateral loads (wind loads)." (Doc. 17-34 at 4; Doc. 17-43 at 2.)  The photos also illustrate Mr. Jones's warning that "the natural stability of these components would not likely be able to successfully resist wind pressures associated with a severe windstorm or hurricane without structural damage *or collapse*." (Doc. 17-34 at 18 (emphasis added).)



Doc. 17-21 – 101 Pear Street (taken September 27, 2016)



Doc. 17-22 – 101 Pear Street (taken September 27, 2016)

On September 29, 2016, this Court denied Mr. Tisdale's motion to include the property at 101 Pear Street in the temporary restraining order. (Doc. 17-35.)  This Court noted that Mr. Tisdale' motion was futile, because the temporary restraining order had expired on August 26, 2016.  (Doc. 17-35 at 2.)  This Court also ruled that Mr. Tisdale's motion did not meet the requirements of Rule 65(b)(1) of the Federal Rules of Civil Procedure.  (Doc. 17-35 at 3.)

Having lost in federal court, Mr. Tisdale filed suit against the City in the Covington County circuit court on September 30, 2016, seeking a restraining order to stop the City from demolishing the building at 101 Pear Street.  (Doc. 2-8.)  The Covington County circuit court issued a temporary restraining order the same day and set a trial for October 7, 2016.  (Doc. 17-36.)  The Covington County circuit court ordered Mr. Tisdale to post a bond no later than October 3, 2016.  (Doc. 17-36 at 2, ¶ 5.)

On October 3, 2016, Mr. Tisdale attempted to perform work on the building without first obtaining a permit and received a citation from the City.[2] (Doc. 17-20 at 2.)  On October 4, 2016, the state court dissolved its temporary restraining order because Mr. Tisdale failed to post the bond.  (Doc. 17-37.) The City then demolished the building at 101 Pear Street.  (Doc. 2 at 5, line 5.)

---

[2] On June 19, 2017, the Andalusia municipal court adjudicated Mr. Tisdale guilty of failing to obtain a permit.  (Doc. 17-20 at 3-4.)   Mr. Tisdale did not appeal his conviction, and that judgment is final.  (Doc. 17-20.)

**C.      The Mediation Settlement Agreement**

On December 19, 2016, the Tisdales and the City reached an agreement to settle the Tisdales' federal court lawsuit.  (Doc. 2-9)  The Tisdales agreed to dismiss their claims in the federal lawsuit with prejudice:

> Plaintiffs further agree to cooperate fully and execute, either personally, or by and through their attorneys, any and all supplementary documents, including a Joint Stipulation of Dismissal With Prejudice, to immediately dissolve the temporary restraining order and to terminate the aforementioned litigation filed in the United States District Court for the Middle District of Alabama, Northern Division, Civil Action Number 2:16-cv-00387-WKW-SRW, with the aim and intent of dismissing said action, with prejudice, each party to bear his, her, or its own costs, expenses and attorneys' fees, and to take all actions which may be necessary to give full force and effect to the basic terms and intent of this Agreement and Release, including the immediate and unequivocal release of the Releasees with prejudice forever, with any and all private persons and entities or public officials, agencies, entities and courts, including the United States District Court for the Middle District of Alabama.

(Doc. 2-9 at 9, ¶ 14.)

On December 20, 2016, the Tisdales and the City filed a joint stipulation of dismissal with prejudice.  (Doc. 17-29.)  On December 22, 2016, this Court entered an order noting the dismissal of that action with prejudice.  (Doc. 17-30.)

The Tisdales also granted the City a general release:

> Plaintiffs hereby fully release and acquit and forever discharge the City of Andalusia, Alabama, and all of its present and former employees, agents, officers, elected officials, and appointed officials, in their individual and official capacities, and their heirs, executors, administrators, officers, employees, servants, agents, successors, assigns, employers, supervisors, attorneys, any persons or entities who have acted on behalf of or at the request of said Releasees, and any persons or entities who controlled, directed, supervised, or trained said Releasees, or who were

22

controlled, directed, supervised, or trained by such Releasees, and all other persons and entities of whatever kind or character from any and all rights, claims, actions, causes of action, demands, damages, costs, declaratory relief, equitable relief, injunctive relief, expenses, and attorneys' fees, of any kind whatsoever, whether statutory or common law, whether based in state or federal law, which Plaintiffs now have or may hereinafter accrue, known or unknown, now existing or that might arise in the future, directly or indirectly attributable to the alleged conduct of Defendant and/or Releasees, including any claims for any act, intentional act, error or omission, including deprivation of equal protection, deprivation of due process, taking, malicious prosecution, trespass, unconstitutional search or seizure, outrage, other violation of the state or federal constitution, and any other cause of action, whatsoever, which was alleged in that certain aforementioned litigation filed in the United States District Court for the Middle District of Alabama, Northern Division, Civil Action Number 2:16-cv-00387-WKW-SRW.  Notwithstanding the foregoing, this release shall not apply to any claims asserted in the lawsuit styled John W. Tisdale, Jr. v. City of Andalusia, which is pending in the Circuit Court of Covington County as case number 23-CV-2016-000021.00, with respect to the property located at 101 Pear Street, Andalusia, Alabama.

(Doc. 2-9 at 2, ¶ 1.)

The general release applies to all claims against the City, except those actually asserted in the separate Covington County circuit court lawsuit related to the property at 101 Pear Street.  (Doc. 2-9 at 2, ¶ 1.)  As to the Pear Street property, the mediation settlement agreement excluded only those claims actually asserted in that state court lawsuit.  (Doc. 2-9 at 2, ¶ 1.)  Again, the state court lawsuit sought only a restraining order to prevent the demolition of the building, and the building has now been demolished.  (Doc. 2 at 5, line 5; Doc. 2-8.)

The mediation settlement agreement also established deadlines for the Tisdales to remediate, and permit the inspection of, the property at 233 South

Cotton Street, the lot adjacent to 233 South Cotton Street, the property at 201

South Three Notch Street, and the property at 254 Historic Central Street.  For

the property at 233 South Cotton Street, the Tisdales agreed:

> 1. To install a roof that meets the requirements of the International Building Code 2006 no later than April 1, 2017;
>
> 2. To remedy the other defects identified in the Notice of Intent to Repair dated April 29, 2016, and the city council findings attached thereto, by July 1, 2017;
>
> 3. To permit a complete inspection of the premises on or about January 9, 2017;
>
> 4. To permit a complete inspection of the premises at 10:00 a.m. on the last Thursday of every month.

(Doc. 2-9 at 3, ¶ 2.)  The Tisdales further agreed:

> In the event that the aforementioned roof installation is not complete *by April 1, 2017*; or in the event that all of the defects identified in the Notice of Intent to Repair dated April 29, 2016, and the city council findings attached thereto, have not been remedied *by July 1, 2017*; or alternatively in the event Plaintiffs fail to allow complete inspections as required by this Agreement, *Defendant shall be entitled to proceed with abatement of the property as provided in City Ordinance number 2015-03.*

(Doc. 2-9 at 3, ¶ 2 (emphasis added).)

> For the lot adjacent to 233 South Cotton Street, the Tisdales agreed:
>
> 1. To padlock, and post no trespassing signs upon, any rail cars and locomotives;
>
> 2. To erect either a chain link or wrought iron fence that fully encloses the rail cars and locomotives by July 1, 2017;
>
> 3. To remedy the defects identified in the Notice of Intent to Demolish dated April 30, 2016, and the city council findings attached thereto, by July 1, 2017; and
>
> 4. To permit a complete inspection of the premises at 10:00 a.m. on the last Thursday of every month.

(Doc. 2-9 at 4, ¶ 3.)  The Tisdales further agreed:

> In the event all of the defects identified in the Notice of Intent to Demolish dated April 30, 2016, and the city council findings attached thereto, have not been remedied to the reasonable satisfaction of the Appropriate Municipal Official, as defined by City Ordinance number 2015-03, *by July 1, 2017*, or alternatively in the event Plaintiffs fail to allow complete inspections as required by this Agreement, *Defendant shall be entitled to proceed with abatement of the property as provided in City Ordinance number 2015-03.*

(Doc. 2-9 at 4, ¶ 3 (emphasis added).)

For the property at 201 South Three Notch Street, the Tisdales agreed:

> 1. To install all necessary downspouts, trim all windows, and paint the exterior woodwork no later than March 1, 2017;
>
> 2. To remedy the defects identified in the Notice of Intent to Repair dated April 29, 2016, and the city council findings attached thereto, by July 1, 2017; and
>
> 3. To permit a complete inspection of the premises at 10:00 a.m. on the last Thursday of every month.

(Doc. 5 at 5, ¶ 5.)  The Tisdales further agreed:

> In the event Plaintiffs fail to install all necessary downspouts, trim all windows, and paint the exterior woodwork *no later than March 1, 2017*; or in the event all of the defects identified in the Notice of Intent to Repair dated April 29, 2016, and the city council findings attached thereto, have not been remedied to the reasonable satisfaction of the Appropriate Municipal Official, as defined by City Ordinance number 2015-03, *by July 1, 2017*; or alternatively in the event Plaintiffs fail to allow complete inspections as required by this Agreement, *Defendant shall be entitled to proceed with abatement of the property as provided in City Ordinance number 2015-03.*

(Doc. 2-9 at 5-6, ¶ 5 (emphasis added).)

For the property at 254 Historic Central Street, the Tisdales agreed to:

> 1. To remedy the defects identified in the Notice of Intent to Demolish dated April 29, 2016, and the city council findings attached thereto, by July 1, 2017; and
>
> 2. To permit a complete inspection of the premises at 10:00 a.m. on the last Thursday of every month.

(Doc. 2-9 at 6, ¶ 6.)  The Tisdales further agreed:

> In the event all of the defects identified in the Notice of Intent to Demolish dated April 29, 2016, and the city council findings attached thereto, have not been remedied to the reasonable satisfaction of the Appropriate Municipal Official, as defined by City Ordinance number 2015-03, *by July 1, 2017*, or alternatively in the event Plaintiffs fail to allow complete inspections as required by this Agreement, *Defendant shall be entitled to proceed with abatement of the property as provided in City Ordinance number 2015-03.*

(Doc. 2-9 at 6-7, ¶ 6 (emphasis added).)

To be clear, the City had already completed the legal requirements to enter and abate the Tisdales' properties without the Tisdales' consent pursuant to its Ordinance Concerning Unsafe Structures and Dangerous Buildings. (Doc. 2-2; Doc. 2-3; Doc. 17-12; Doc. 17-13; Doc. 17-14; Doc. 17-15; Doc. 17-16; Doc. 17-17; Doc. 17-18; Doc. 17-19; Doc. 17-38; Doc. 17-39; Doc. 17-40.) The Tisdales had failed to exercise their right to appeal the city council's abatement decisions to the Covington County circuit court.  (Doc. 22-1 at 6, ¶ 12; Doc. 2-2 at 11; Doc. 17-38 at 12.)   Under the mediation settlement agreement, the City only agreed to forbear from taking abatement action provided that the Tisdales fulfilled their obligations under that agreement: "Defendant agrees to forbear from taking abatement action on this property until July 1, 2017 . . . ."  (Doc. 2-9 at 3-6, ¶¶ 2, 3, 5, 6.)  The Tisdales acknowledged that the City was merely forbearing from taking action that was

26

already legally authorized: "Plaintiffs hereby waive any objection to the delay in the abatement and agreed that Defendant's time for accomplishing the abatement shall be extended until October 1, 2017." (Doc. 2-9 at 3-7, ¶¶ 2-3, 5-6.)

Ultimately, the Tisdales did not meet their abatement deadlines for any of the properties and thereby breached the mediation settlement agreement. (Doc. 22-1 at 8, ¶ 17.)  The declaration of building inspector Richard Moore explains how the Tisdales breached the mediation settlement agreement.  (Doc. 22-1 at 8-12, ¶¶ 17-31.)

With respect to the property located at 233 South Cotton Street, the mediation settlement agreement required the Tisdales, among other things, to remedy all of the defects identified in the Notice of Intent to Repair dated April 29, 2016, and the city council findings attached thereto, by July 1, 2017.  (Doc. 2-9 at 3, ¶ 2.)  Exhibit 16 is a true and correct copy of the Notice of Intent to Repair dated April 29, 2016.  (Doc. 22-1 at 8, ¶ 18; Doc. 17-16; see also Doc. 2-3 at 15-21.)

The Tisdales failed to satisfy paragraph 1 of the city council findings with respect to the property at 233 South Cotton Street in that they failed to demolish the long wooden structure adjoining the back of the brick building, or to restore that structure to a condition that meets the building code, by July 1, 2017.  (Doc. 22-1 at 8, ¶ 19.)  As of July 1, 2017, the floor joists that had previously been identified as deteriorated remained deteriorated.  (Doc. 22-1 at 8, ¶ 19.)  As of July 1, 2017, the roof trusses and exposed decking on top of the

roof trusses that had previously been identified as rotten and deteriorated remained rotten and deteriorated.  (Doc. 22-1 at 8, ¶ 19.)  As of July 1, 2017, the tail ends of the rafters that had previously been identified as deteriorated remained deteriorated.  (Doc. 22-1 at 8-9, ¶ 19.)  The Tisdales also failed to remove all building materials stored on the property by July 1, 2017.  (Doc. 22-1 at 9, ¶ 19.)  The Tisdales also failed to remove all wood, iron parts, and equipment left on the property by July 1, 2017.  (Doc. 22-1 at 9, ¶ 19.)  The Tisdales also failed to remove all scrap, junk, and non-functioning equipment stored on the property by July 1, 2017.  (Doc. 22-1 at 9, ¶ 19.)

The Tisdales also failed to satisfy paragraph 2 of the city council findings as to the property at 233 South Cotton Street by July 1, 2017.  (Doc. 22-1 at 9, ¶ 20.)  Graffiti remained visible on the south and east exterior walls of the building after July 1, 2017.  (Doc. 22-1 at 9, ¶ 20.)

The Tisdales also failed to satisfy paragraph 3 of the city council findings as to the property at 233 South Cotton Street.  (Doc. 22-1 at 9, ¶ 21.)  The window and doors on the wooden structure adjoining the back of the brick building did not have a tight weather seal by July 1, 2017.  (Doc. 22-1 at 9, ¶ 21.)  As of July 1, 2017, plywood covered the window, and the doors were not weather tight.  (Doc. 22-1 at 9, ¶ 21.)

With respect to the lot adjacent to 233 South Cotton Street, the mediation settlement agreement required the Tisdales, among other things, to padlock all rail cars and locomotives on the premises and post "no trespassing" signs no later than December 26, 2016.  (Doc. 2-9 at 4, ¶ 3.)  The Tisdales did

not post "no trespassing" signs by December 26, 2016.  (Doc. 22-1 at 9, ¶ 22.)
The mediation settlement agreement also required the Tisdales to erect either a
chain link or wrought iron fence that fully enclosed the rail cars and
locomotives by July 1, 2017.  (Doc. 2-9 at 4, ¶ 3.)  The Tisdales did not erect a
fence by July 1, 2017.  (Doc. 22-1 at 10, ¶ 22.)

With respect to the lot adjacent to 233 South Cotton Street, the
mediation settlement agreement also required the Tisdales to remedy all of the
defects identified in the Notice of Intent to Demolish dated April 30, 2016, and
the city council findings attached thereto, by July 1, 2017.  (Doc. 2-9 at 4, ¶ 3.)
Exhibit 17 is a true and correct copy of the Notice of Intent to Demolish dated
April 30, 2016.  (Doc. 22-1 at 10, ¶ 23; Doc. 17-17; <u>see also</u> Doc. 2-3 at 1-7.)

The Tisdales failed to satisfy paragraph 1 of the city council findings with
respect to the lot adjacent to 233 South Cotton Street in that they failed to
remove all scrap, junk, rubbish, building debris, and building materials from
the property by July 1, 2017.  (Doc. 22-1 at 10, ¶ 24.)  The Tisdales also failed
to satisfy paragraph 1 of the City council findings with respect to the lot
adjacent to 233 South Cotton Street in that they failed to remove or cut all
vegetation, overgrowth, grass, and weeds from the property by July 1, 2017.
(Doc. 22-1 at 10, ¶ 24.)

 With respect to the property at 201 South Three Notch Street, the
mediation settlement agreement required the Tisdales, among other things, to
install all necessary downspouts, trim all windows, and paint the exterior
woodwork no later than March 1, 2017.  (Doc. 2-9 at 5, ¶ 5.)  The Tisdales did

not install the necessary downspouts by March 1, 2017.  (Doc. 22-1 at 10, ¶ 25.)  The Tisdales did not trim all windows by March 1, 2017.  (Doc. 22-1 at 10-11, ¶ 25.)  The Tisdales did not paint all of the exterior woodwork by March 1, 2017.  (Doc. 22-1 at 11, ¶ 25.)

With respect to the property at 201 South Three Notch Street, the mediation settlement agreement also required the Tisdales to remedy all of the defects identified in the Notice of Intent to Repair dated April 29, 2016, and the city council findings attached thereto, by July 1, 2017.  (Doc. 2-9 at 5, ¶ 5.)  Exhibit 18 is a true and correct copy of the Notice of Intent to Repair dated April 29, 2016.  (Doc. 22-1 at 11, ¶ 26; Doc. 17-18; see also Doc. 2-3 at 22-27.)  The Tisdales failed to satisfy paragraph 3 of the City council findings with respect to the property at 201 South Three Notch Street in that they failed to repair all cornice work and overhangs by July 1, 2017.  (Doc. 22-1 at 11, ¶ 26.)

The Tisdales also failed to satisfy paragraph 5 of the City council findings with respect to the property at 201 South Three Notch Street in that they failed to repair all mortar or masonry joints on the parapet wall and the mortar or masonry joints of the walls from the roof water discharge at the defective down spouts by July 1, 2017.  (Doc. 22-1 at 11, ¶ 27.)

As for paragraph 1 of the city council findings with respect to the property at 201 South Three Notch Street, the Tisdales had already failed to seal the exterior windows to ensure that they were weather tight by March 1, 2017.  (Doc. 22-1 at 11, ¶ 28.)  Paragraph 5 of the mediation settlement

agreement required the Tisdales to perform that aspect of the work by March 1, 2017.  (Doc. 2-9 at 5, ¶ 5.)

With respect to the property at 254 Historic Central Street, the mediation settlement agreement required the Tisdales to remedy all of the defects identified in the Notice of Intent to Demolish dated April 29, 2016, and the city council findings attached thereto, by July 1, 2017.  (Doc. 2-9 at 6, ¶ 6.) Exhibit 19 is a true and correct copy of the Notice of Intent to Demolish dated April 29, 2016.  (Doc. 22-1 at 12, ¶ 29; Doc. 17-19; see also Doc. 2-3 at 8-14.)

The Tisdales failed to satisfy paragraph 1 of the city council findings with respect to the property at 254 Historic Central Street in that they failed to remove all building materials, building debris, scrap, junk, rubbish, and trash from the property by July 1, 2017.  (Doc. 22-1 at 12, ¶ 30.)  The Tisdales also failed to satisfy paragraph 1 of the City council findings with respect to the property at 254 Historic Central Street in that they failed to remove or cut all vegetation, overgrowth, grass, and weeds from the property by July 1, 2017. (Doc. 22-1 at 12, ¶ 30.)

The Tisdales failed to satisfy paragraph 2 of the City council findings with respect to the property at 254 Historic Central Street in that they failed to remove all deteriorated structures from the property by July 1, 2017.  (Doc. 22-1 at 12, ¶ 31.)

The City proceeded with the abatements of the properties at 233 South Cotton Street, 201 South Three Notch Street, and 254 Historic Central Street, and the lot adjacent to 233 South Cotton Street, only after the Tisdales missed

their deadlines and thereby breached the terms of the mediation settlement agreement. (Doc. 22-1 at 12-13, ¶ 32.)

The inspection about which the Tisdales complain in their Amended Complaint occurred in September 2017, (Doc. 2 at 5, ¶ 13; Doc. 8-2 at 6-7), which was *after* the Tisdales missed their deadlines and breached the terms of the mediation settlement agreement, (Doc. 22-1 at 13, ¶ 33).  By September 2017, all of the Tisdales' deadlines in the mediation settlement agreement had expired, and the City was no longer obligated to forbear from executing the abatement orders issued by the city council: "Defendant agrees to forbear from taking abatement action on this property *until July 1, 2017 . . . ."* (Doc. 2-9 at 3-6, ¶¶ 2, 3, 5, 6 (emphasis added); Doc. 22-1 at 13, ¶ 33.)  In fact, the mediation settlement agreement specifically authorized the City to proceed with the abatements if the Tisdales did not meet their remediation deadlines: "Defendant shall be entitled to proceed with abatement of the property."  (Doc. 2-9 at 3-7, ¶¶ 2, 3, 5, 6.)

City officials were also authorized to enter the Tisdales' properties by the terms of the ordinance:

> Upon presentation of the proper credentials, an Appropriate Municipal Official may enter any building, structure, part of building or structure, party wall, foundation, or premises for the purpose of inspection, to prevent violation of the provisions of this Article, and/or to carry out an order given pursuant to this Article.

(Doc. 2-2 at 3, § 5-101(c); Doc. 17-38 at 4, § 5-101(c).)[3]

---

[3] In the mediation settlement agreement, the Tisdales also expressly agreed to "permit the Andalusia Fire Chief to inspect the premises upon request."  (Doc. 2-9 at 7, ¶ 8.)

The Amended Complaint complains about the September 15, 2017 inspection conducted by building inspector Richard Moore.  (Doc. 2 at 5, ¶ 13.) As a building inspector, (Doc. 22-1 at 2, ¶ 2), Mr. Moore qualifies as an "Appropriate Municipal Official" to perform inspections under the ordinance:

> The term 'Appropriate Municipal Official' as used in this Article shall mean the City building official, any *City building inspections officer* or deputy and any other City official or City employee designated by the Mayor as a person to exercise the authority and perform the duties delegated by this Article.  This term may refer to one or more persons, and where the term refers to more than one person, those persons designated as an Appropriate Municipal Official are authorized to act, either together or individually as the circumstances permit, to exercise the authority and perform the duties delegated by this Article.

(Doc. 2-2 at 2-3, § 5-101(a); Doc. 17-38 at 3-4, § 5-101(a) (emphasis added).)

The Tisdales allege that the mediation settlement agreement afforded them the right to be accompanied by an architect or engineer during the inspection.  (Doc. 2 at 5, ¶ 13.)  The language in question reads:

> To the extent the properties identified in this Agreement are subject to a remediation or repair deadline, Plaintiff may request Defendants' officials to inspect preliminarily one or more of those properties in order to obtain a preliminary assessment of whether or not Plaintiffs have remedied the defects, or made the repairs, to Defendant's satisfaction.   The purpose of the preliminary inspection is to allow Plaintiffs an opportunity to cure any deficiencies before the July 1, 2017 deadline.   *Plaintiff may be accompanied by architect Joe Donofro during any inspection, or any other architect or structural engineer of his choosing.*   Under no circumstances shall the preliminary inspection process lead to an extension of a final deadline.   Under no circumstances shall a preliminary inspection constitute a substitute for any other inspection contemplated this Agreement, unless the City in its sole discretion determines that further inspection is unnecessary.

(Doc. 2-9 at 7, ¶ 7 (emphasis added).)

There are three problems with the Tisdales' argument. First, the provision about which the Tisdales complain relates to *preliminary inspections* "[t]o the extent the properties identified in this Agreement are subject to a remediation or repair deadline." (Doc. 2-9 at 7, ¶ 7.) As the paragraph explains, "[t]he purpose of the preliminary inspection is to allow [the Tisdales] an opportunity to cure any deficiencies *before the July 1, 2017 deadline*." (Doc. 2-9 at 7, ¶ 7 (emphasis added).) In the Amended Complaint, the Tisdales are complaining about events that occurred *after* their remediation deadlines expired. (Doc. 2 at 5-6.) After the Tisdales missed their deadlines, the City was entitled to proceed with the abatements. (Doc. 2-9 at 3-7, ¶¶ 2, 3, 5, 6.)

Second, the City actually "welcome[d]" the Tisdales to bring their architect or structural engineer to each inspection. (Doc. 2-10 at 2; Doc. 2-14 at 2.) The Tisdales have attached to the Amended Complaint an email from city attorney Mark Christensen to the Tisdales' attorney dated September 13, 2017, in which Mr. Christensen welcomed the Tisdales' engineer and/or architect to attend the September 15, 2017 inspection: "Mr. Tisdale's engineer and/or architect are welcome to attend." (Doc. 2-10 at 2.) The Tisdales also attached a letter from city attorney Christensen to the Tisdales' attorney dated September 15, 2017, in which Mr. Christensen welcomed the Tisdales' structural engineer to attend the September 19, 2017 inspection: "Mr. Tisdale is welcome to have his own structural engineer present during the inspection."[4] (Doc. 2-14 at 2.) The Tisdales' own submissions prove the falsity of their claim

---

[4] City attorney Christensen invited the Tisdales to bring their structural engineer because the City was having its structural engineer examine the building. (Doc. 2-14 at 2.)

that the City denied them an opportunity to bring their own architect or engineer to an inspection.  (Doc. 2-10 at 2; Doc. 2-14 at 2.)

Third, the mediation settlement agreement did *not* require city officials to accommodate the schedule of the Tisdales' architect or engineer.  (Doc. 2-9 at 7, ¶ 7.)  The City was only required to permit the architect or engineer to attend preliminary inspections.   (Doc. 2-9 at 7, ¶ 7.)   An email attached to the Amended Complaint discloses that the Tisdales' representative did not attend the inspections on September 15 and September 19 because he was not available: "September 22nd . . . is the first date our guy is available."  (Doc. 2-10 at 1.)

The mediation settlement agreement set a deadline of October 1, 2017, for the City to complete its abatement work.  (Doc. 2-9 at 3-7, ¶¶ 2, 3, 5, 6.) The City has now completed its abatement work on all four properties: the property at 233 South Cotton Street, the lot adjacent to 233 South Cotton Street, the property at 201 South Three Notch Street, and property at 254 Historic Central Street.   (Doc. 22-1 at 13, ¶ 34.)   The City completed its abatement work by its October 1, 2017 deadline.  (Doc. 22-1 at 13, ¶ 34.)

D.    **The City's Response to Specific Allegations**

Several of the Amended Complaint's allegations warrant a response.  The Amended Complaint misstates the length of time the City afforded the Tisdales to remedy their dilapidated properties.  The Amended Complaint alleges that the City's abatement efforts began in April 2016.  (Doc. 2 at 3, ¶ 13; Doc. 8 at 5.)  The City actually initiated its efforts on November 18, 2015.  (Doc. 17-5;

Doc. 17-6; Doc. 17-7; Doc. 17-8; Doc. 17-9; Doc. 17-10; Doc. 17-11.)  By the time the dispute over access to perform the abatements arose in September 2017, the Tisdales had been stalling for over *twenty-one months*.  The City had granted a ninety-day extension on March 1, 2016.  (Doc. 22-1 at 6, ¶ 11; Doc. 17-40 at 3, 5.)  The City had withheld abatement action when the temporary restraining order expired in August 2016.  (Doc. 17-35 at 2, ¶ 2.)  The City had granted another extension in the mediation settlement agreement.  (Doc. 2-9.)  Even after the July 1, 2017 deadline expired, the City waited over two months – until September 2017 – to proceed with the abatements. (Doc. 8-2 at 6-7.)  By that point, the City had no choice – its abatement deadline was October 1, 2017.  (Doc. 2-9 at 3-7, ¶¶ 2, 3, 5, 6.)

The Amended Complaint vaguely allege that the City issued stop work orders to prevent the Tisdales from performing repairs.  (Doc. 2 at 4, ¶ 13.)  The City did not issue any stop work orders regarding the property at 233 South Cotton Street, the lot adjacent to 233 South Cotton Street, the property at 201 South Three Notch Street, or the property at 254 Historic Central Street.  (Doc. 22-1 at 13-14, ¶ 35.)  The Tisdales only attached one stop work order to the Amended Complaint.  (Doc. 2-4.)  As the Amended Complaint admits, (Doc. 2 at 4, ¶ 13, lines 20-22), that stop work order applied to the property at 101 Pear Street, (Doc. 22-1 at 13, ¶ 35; Doc. 17-34 at 23, ¶ 2).

With regard to the stop work order for 101 Pear Street, on October 3, 2016, building inspector Richard Moore also issued a summons to Mr. Tisdale for performing work without first obtaining a permit.  (Doc. 22-1 at 14, ¶ 36.)

The second page of Exhibit 20 is a true and correct of that summons.  (Doc. 17-20 at 2.)  The certified court records contained in Exhibit 20 reflect that Mr. Tisdale was adjudicated guilty of that offense by the Andalusia municipal court and did not appeal his conviction.  (Doc. 17-20 at 3-4.)  Mr. Tisdale's conviction proves the validity of the stop work order.  (Doc. 17-20 at 3-4.)

The reason that the Tisdales never received a building permit for 101 Pear Street is that they never complied with Alabama Code section 34-2-32 by submitting sealed architectural or engineering drawings for the corrective measures required to stabilize the structure and prevent its collapse.  (Doc. 22-1 at 14, ¶ 37.)  In pertinent part, Alabama Code section 34-2-32(c) states:

> The services of a registered architect shall be required on all buildings except those hereinabove exempted and no official of this state or of any city, town, or county herein charged with the enforcement of laws, ordinances, or regulations relating to the construction or alteration of buildings, shall accept or approve any plans or specifications that are not so prepared.

Ala. Code § 34-2-32(c) (1975).

The seal requirements are established by Alabama Administrative Code regulations 100-X-5-.03 and 330-X-11-.03.  (Doc. 22-1 at 14, ¶ 37.)  In pertinent part, regulation 100-X-5-.03 states:

> . . . The seal shall be used to identify all drawings, duplication of drawings, plans, specifications, plats and reports issued from his or her office for use in this state.  . . .
>
> (1) The architect's seal must be affixed on all final drawings, plans, specifications, plats and reports whenever presented to a client or any public or governmental agency for the purpose of obtaining a permit for construction.  . . .

Ala. Admin. Code 100-X-5-.03.

37

In pertinent part, regulation 330-X-11-.03 states:

(3) . . .

     (a) Each design sheet for engineering practice and each map, plat or chart sheets for land surveying practice, shall be signed, sealed, and dated by the licensee who prepared the documents or under whose responsible charge the documents were prepared.

. . .

(6) The seal, signature, and date of signing shall be placed on all final specifications, land surveys, reports, plats, drawings, plans, design information, and calculations whenever presented to a client or any public or governmental agency to certify that the work was done by the licensee or under the responsible charge of the licensee. . . .

Ala. Admin. Code 330-X-11-.03.

It appeared to building inspector Richard Moore that Mr. Tisdale was attempting to perform major work that affected the building's structural integrity without a proper architectural or engineering design. (Doc. 22-1 at 14, ¶ 37.)

The Amended Complaint alleges that the City only allowed the Tisdales fourteen days to remediate the building at 101 Pear Street. (Doc. 2 at 4, ¶ 13, lines 15-17.) The certified copies of the council minutes prove that the council granted fourteen days during its meeting of September 6, 2016, (Doc. 17-41 at 4), and then granted an additional seven days in its meeting of September 20, 2016, (Doc. 17-42 at 3). A letter that Mr. Tisdale signed and submitted to this Court in the first federal lawsuit acknowledges both periods. (Doc. 17-34 at 22, ¶ 2; Doc. 17-34 at 23, ¶ 1; Doc. 17-34 at 24.)

The Amended Complaint alleges that the City demolished the 101 Pear Street building while the state court lawsuit was pending.  (Doc. 2 at 5, ¶ 13, lines 4-5.)  However, the City obeyed the state court's temporary restraining order while that order was in place, (Doc. 17-36), and only demolished the building after the state court dissolved the order when Mr. Tisdale failed to post a bond, (Doc. 17-37).[5]

The Amended Complaint alleges that the City would not allow the Tisdales to have their architect present for the September 15, 2017 inspection.  (Doc. 2 at 5, ¶ 13, line 15.)  Yet, in an email dated September 13, 2017, city attorney Mark Christensen informed Mr. Tisdale's attorney that "Mr. Tisdale's engineer and/or architect are *welcome* to attend."  (Doc. 2-10 at 2 (emphasis added).)  An email attached to the Amended Complaint reveals that the Tisdales' architect did not attend the inspection because he was not available:  "September 22nd . . . is the first date our guy is available."  (Doc. 2-10 at 1.)

The Amended Complaint identifies several properties that it contends support an equal protection claim.  (Doc. 2 at 7-8, ¶ 17.)  In his declaration, building inspector Richard Moore explains why the properties that the Tisdales identify as comparators are not similarly situated to the properties at issue in this case.  (Doc. 22-1 at 18-20, ¶¶ 43-52.)  As to the properties identified as belonging to the "Merrill family," the property on South Cotton Street was

---

[5] Mr. Tisdale did not even own the property at 101 Pear Street; Tisdale Family Properties, Inc. owned it.  (Doc. 17-32.)  Yet, Mr. Tisdale, not the corporation, obtained the temporary restraining order.  (Doc. 2-8; Doc. 17-36.)  The City moved to dismiss Mr. Tisdale's state court lawsuit for lack of standing, but the state court denied the motion.  The Alabama Supreme Court later denied the City's petition for writ of mandamus without opinion.

previously occupied by Wilco Welding.  (Doc. 22-1 at 18, ¶ 43.)  The proprietor of Wilco Welding was William Merrill, who is now deceased.  (Doc. 22-1 at 18, ¶ 43.)  Before his death, Mr. Merrill hired a contractor to repair the roof of that building.  (Doc. 22-1 at 18, ¶ 43.)  The contractor obtained a permit on November 19, 2015, and made the repairs.  (Doc. 22-1 at 18, ¶ 43.)  The repairs passed inspection.  (Doc. 22-1 at 18, ¶ 43.)  Mr. Merrill made those repairs without the necessity of an abatement.  (Doc. 22-1 at 18, ¶ 43.)  The building is structurally sound, and the new owner is in the process of leasing it to a repair business.  (Doc. 22-1 at 18, ¶ 43.)

The property on Morrison Street actually has a Jernigan Street address. (Doc. 22-1 at 18, ¶ 44.)  It sits at the corner of Morrison and Jernigan Streets. (Doc. 22-1 at 18, ¶ 44.)  It was not owned by Mr. Merrill.  (Doc. 22-1 at 18, ¶ 44.)  It was owned by Elrand Denson and Danny Lee.  (Doc. 22-1 at 18, ¶ 44.) The City initiated abatement measures against that property on May 24, 2016. (Doc. 22-1 at 18, ¶ 44.)  The city council formally voted to abate the property in 2017, and the City subsequently entered into a remediation agreement with the owners.  (Doc. 22-1 at 18, ¶ 44.)

The "six" properties on Tisdale Street consist of only three structures. (Doc. 22-1 at 19, ¶ 45.)  Mr. Merrill did not actually own those properties. (Doc. 22-1 at 19, ¶ 45.)  They were owned by his brother's corporation.  (Doc. 22-1 at 19, ¶ 45.)  A new owner has cleaned, and is repairing, those properties and is in the process of converting the space for use as a wedding venue.  (Doc. 22-1 at 19, ¶ 45.)

The City initiated abatement measures against the Frank Henderson property on Montgomery Street on May 25, 2016.  (Doc. 22-1 at 19, ¶ 46.)  The owner cooperated, the structure has been demolished, and the abatement is complete.  (Doc. 22-1 at 19, ¶ 46.)  It was not necessary for the city council to become involved, because the property owner cooperated with city officials.  (Doc. 22-1 at 19, ¶ 46.)

The City has ongoing abatement negotiations with the owner of the Harry Huggins building.  (Doc. 22-1 at 19, ¶ 47.)  The building needs some brick repairs, but the walls are structurally sound.  (Doc. 22-1 at 19, ¶ 47.)  The roof is intact, although it needs repairs in two sections.  (Doc. 22-1 at 19, ¶ 47.)  The City is in the process of negotiating an agreement with the owner.  (Doc. 22-1 at 19, ¶ 47.)  The owner reports that she is obtaining repair estimates from contractors.  (Doc. 22-1 at 19, ¶ 47.)

Building inspector Richard Moore's house on Crescent Street is structurally sound.  (Doc. 22-1 at 19, ¶ 48.)  The roof is intact.  (Doc. 22-1 at 19, ¶ 48.)  The house is weather sealed.  (Doc. 22-1 at 19, ¶ 48.)  It is Mr. Moore's private residence.  (Doc. 22-1 at 19, ¶ 48.)  None of the Tisdales' properties involved in this case are residential in nature.[6]  (Doc. 22-1 at 19, ¶ 48.)

Dr. Rex Butler's shopping center is structurally sound, the roof is intact, and the building is weather sealed.  (Doc. 22-1 at 19, ¶ 49.)  The building was renovated and re-roofed in the early 2000's.  (Doc. 22-1 at 20, ¶ 49.)  The only

---

[6] The Tisdales' inclusion of building inspector Richard Moore's private residence in their list of comparators to their *non-residential* properties is a personal attack on Mr. Moore.

problems are that a Dollar General delivery truck backed into a corner column of the canopy over the walkway in front of the building, and an adjacent building on the property needs painting.  (Doc. 22-1 at 20, ¶ 49.)

The old Coca-Cola plant is owned by the City.  (Doc. 22-1 at 20, ¶ 50.) Building inspector Richard Moore is not aware of any asbestos in that building. (Doc. 22-1 at 20, ¶ 50.)  Mr. Moore has looked for open electrical panels, but did not find any.  (Doc. 22-1 at 20, ¶ 50.)  In any event, the building does not have electrical power.  (Doc. 22-1 at 20, ¶ 50.)

The city block between Montgomery and Watson Streets is actually the City's public works storage yard.  (Doc. 22-1 at 20, ¶ 51.)  The City uses that property to store concrete culvert pipe, topsoil, asphalt milling, sand, and other fill materials.   (Doc. 22-1 at 20, ¶ 51.)   The City keeps the grass cut and maintains the property in good condition.  (Doc. 22-1 at 20, ¶ 51.)

The Scherf Memorial Building on Opp Avenue is also owned by the City. (Doc. 22-1 at 20, ¶ 52.)  It houses police records and a fitness center for the police  and  fire  departments.    (Doc.  22-1  at  20,  ¶  52.)    The  building  is structurally sound and the roof is intact.  (Doc. 22-1 at 20, ¶ 52.)

In  summary,  three  of  the  comparators  that  the  Amended  Complaint identifies are governmental properties, (Doc. 22-1 at 20, ¶¶ 50-52), and one is a residential property, (Doc. 22-1 at 19, ¶ 48).  None of the Tisdales' properties involved in this lawsuit are governmental or residential.  (Doc. 22-1 at 19, ¶ 48; Exs. 23, 24, 25, 26.)  Of the remaining properties:

a) The City initiated abatement measures on two of them before the Tisdales even filed their first federal court lawsuit, (Doc. 22-1 at 18-19, ¶¶ 44, 46);

b) One obtained a permit, made repairs, and passed inspection before the Tisdales filed their first federal lawsuit, (Doc. 22-1 at 18, ¶ 43);

c) One is under new ownership, and the new owner is making repairs, (Doc. 22-1 at 19, ¶ 45);

d) The City has ongoing abatement negotiations with one; (Doc. 22-1 at 19, ¶ 47); and

e) One was renovated and re-roofed in the 2000's and is generally in good condition, except for damage to a corner column of the walkway canopy caused by a vehicular accident, (Doc. 22-1 at 19-20 ¶ 49).

None of these properties is similarly situated to the Tisdales'.

The Amended Complaint alleges that "*[e]arlier this month* . . . the City . . . demolished the building" at 254 Historic Central Street.  (Doc. 2 at 6, ¶ 13 (emphasis added).)  That document was filed September 29, 2017, so "this month" refers to September 2017.  (Doc. 2.)  The mediation settlement agreement required the Tisdales to *complete* the remedial work at 254 Historic Central Street *by July 1, 2017*.  (Doc. 2-9 at 6.)  If the Tisdales had done what they promised to do in the mediation settlement agreement, there would not have been a building to demolish at 254 Historic Central Street in September 2017.  (Doc. 17-19 at 7.)

The amended complaint also complains about City workers making repairs at 201 South Three Notch Street on September 17, 2017.  (Doc. 2 at 6, ¶ 13.)  Again, the City would not have needed to make repairs at 201 South

Three Notch Street in September 2017, if the Tisdales had met their July 1, 2017 deadline.  (Doc. 2-9 at 5-6, ¶ 5.)

The Amended Complaint alleges that the City's Ordinance Concerning Unsafe Structures and Dangerous Buildings allows the City to "unilaterally determine property located within the City limits to be a hazard." (Doc. 2 at 3, ¶ 12.)   That statement is inaccurate.   Except in cases of emergency, the ordinance provides a right to appeal the city council's decision to the Covington County circuit court:

> Any person aggrieved by the decision of the Council at the hearing may, within ten (10) days thereafter, appeal to the Circuit Court of Covington County, Alabama, upon filing with the clerk of the Circuit Court of Covington County, Alabama, notice of the appeal and bond for security of costs in the form and amount to be approved by the Circuit Clerk.

(Doc. 2-2 at 11; Doc. 17-38 at 12.)  The Tisdales suppressed this right of appeal from their filings and failed to disclose that they did not exercise that right as to any of the properties in question.  (Doc. 22-1 at 6, ¶ 12.)

The Amended Complaint also represents that the Ordinance Concerning Unsafe Structures and Dangerous Buildings allows the City to take a citizen's property without compensation.   (Doc. 2 at 3, ¶ 12.)   Not surprisingly, the Tisdales do not identify where in the ordinance they find such a provision.  The City cannot find it.  (Doc. 2-2; Doc. 17-38.)  The City has not taken any of the Tisdales' properties without compensation.  (Doc. 22-1 at 17, ¶ 40.)

The Tisdales specifically contracted to not file a lawsuit like this one:

> In the event the City takes any enforcement and/or abatement action against one or more of Plaintiffs' properties in the future, Plaintiffs agree that their sole avenue to contest such action, or to

44

seek relief based on such action, shall lie within the procedures established by the statutes, code, or ordinance that defines the procedure for the action in question.   In other words, while Plaintiffs shall retain all rights of timely appeal provided by the particular statute, code, or ordinance that defines the procedure for the action in question, Plaintiffs agree not to seek declaratory relief, injunctive relief, monetary damages, attorneys' fees, or costs in a separate legal action under any legal theory, or otherwise to pursue any collateral attack on the enforcement action.   In the event one or more Plaintiffs breach this provision, Plaintiffs agree that the City shall be entitled to recover from Plaintiffs, jointly and severally, all attorneys' fees, costs, and expenses (including City personnel expenses) it incurs in responding to and defending the separate action and/or other collateral attack.

(Doc. 2-9 at 8, ¶ 11.)

Instead of keeping their promises, the Tisdales allowed their deadlines to expire and then filed this action on September 19, 2017, in an attempt to sabotage the City's abatement efforts.   (Doc. 2.)   The Amended Complaint contains five counts:

I.   Count I asserts three § 1983 claims against the City:

   a.   A claim for unlawful search under the Fourth Amendment to the U.S. Constitution;

   b.   An equal protection claim under the Fifth Amendment to the U.S. Constitution: and

   c.   An equal protection claim under the Fourteenth Amendment to the U.S. Constitution.

II.   Count II asserts a state law breach of contract claim against the City alleging that the City breached the contractual provision regarding affording Mr. Tisdale the opportunity to have his architect present during two inspections in September 2017;

III.   Count III asserts a claim against the City under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq.

IV.   Count IV asserts a claim for treble damages against the City under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c); and

V.   Count V asserts a civil conspiracy claim against the City.

(Doc. 2 at 9-13, ¶¶ 19-41.)   None of these counts states a claim upon which relief can be granted, and the Court lacks subject matter jurisdiction over any request for injunctive relief.   In any event, the City is entitled to summary judgment on all claims.

## III.  ANALYSIS

This lawsuit is not an appeal from the city council's declarations of the Tisdales' properties as public nuisances.   Ordinance 2015-03 provided a procedure to appeal to the Covington County circuit court, and the Tisdales did not avail themselves of that procedure.   (Doc. 2-2 at 11; Doc. 17-38 at 12; Doc. 22-1 at 6, ¶ 12.)   "This court does not sit as a court to review whether the property was actually a public nuisance." Guettler v. City of Montgomery, No. 2:11-cv-573-WHA, 2012 WL 1987188, at *7 (M.D. Ala. June 4, 2012).

The City moves to dismiss this action for failure to state a claim upon which relief can be granted and for lack of subject matter jurisdiction.  See Fed. R. Civ. P. 12(b)(1), -(6).   In the alternative, the City moves for summary judgment on all claims.  See Fed. R. Civ. P. 56.

## A.     The Subject Matter Jurisdiction Standard

The City moves to dismiss any claim for injunctive relief based upon the lack of subject matter jurisdiction.   A party may raise this defense by motion.

Fed. R. Civ. P. 12(b)(1). "Attacks on subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) come in two forms: 'facial attacks' and 'factual attacks.'" Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A., 104 F.3d 1256, 1260-61 (11th Cir. 1997). "Facial attacks to subject matter jurisdiction require the court merely to look and see if the plaintiff's complaint has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." Houston v. Marod Supermarkets, Inc., 733 F.3d 1323, 1335-36 (11th Cir. 2013). "Factual attacks on the district court's jurisdiction challenge jurisdiction in fact, irrespective of pleadings, allowing parties to submit matters outside the pleadings, such as testimony or affidavits." Miccosukee Tribe of Indians v. U.S., E.P.A., 105 F.3d 599, 603 (11th Cir. 1997). The City asserts a factual attack on the Court's subject matter jurisdiction over any claim for injunctive relief.

**B.     The Failure-to-State-a-Claim Standard**

The City also moves to dismiss all counts for failure to state a claim upon which relief can be granted. See Fed. R. Civ. P. 12(b)(6). "A pleading that states a claim for relief must contain ... (2) a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me allegation." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).   "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964-65 (2007).   "Factual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965 (2007).

"Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009).   When the allegations of a complaint stop short of

excluding "more likely explanations" or an "obvious alternative explanation," the complaint does not state a plausible claim for relief.  Ashcroft v. Iqbal, 556 U.S. 662, 681-82, 129 S. Ct. 1937, 1951-52 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 567, 127 S. Ct. 1955, 1972 (2007).  A pleading also does not satisfy the requirements of Rule 8 when it merely "le[aves] open the possibility that a plaintiff might later establish some set of undisclosed facts to support recovery."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 561, 127 S. Ct. 1955, 1968 (2007).

"A district court considering a motion to dismiss shall begin by identifying conclusory allegations that are not entitled to an assumption of truth – legal conclusions must be supported by factual allegations."  Randall v. Scott, 610 F.3d 701, 709-10 (11th Cir. 2010).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).

Once the court isolates the factual allegations, "[p]lausibility is the key."  Jacobs v. Tempur-Pedic Int'l, Inc., 626 F.3d 1327, 1333 (11th Cir. 2010).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)).

Also, "[a] complaint is subject to dismissal under Rule 12(b)(6) when its allegations, on their face, show that an affirmative defense bars recovery on the claim." <u>Cottone v. Jenne</u>, 326 F.3d 1352, 1357 (11th Cir. 2003).

### C. The Court May Consider Most of the Exhibits Without Applying the Summary Judgment Standard

The Court may consider most of the exhibits in the record without reaching the summary judgment aspect of this Motion.   For example, the Tisdales attached to the Amended Complaint:

1. The City's Ordinance 2015-03, (Doc. 2-2);

2. The notices of intent to repair and demolish, (Doc. 2-3);

3. The Mediation Settlement Agreement and Release of All Claims, (Doc. 2-9); and

4. Correspondence from city attorney Mark Christensen welcoming Mr. Tisdale to bring his architect and/or engineer to the inspections, (Doc. 2-10; Doc. 2-14).

On a motion to dismiss, courts must consider exhibits attached to a complaint, because they are a part of the complaint for all purposes.  <u>See</u> Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); <u>see also</u> <u>Reed v. Clough</u>, ___ F. App'x ___, No. 16-11659, 2017 WL 2590761, at *4 (11th Cir. June 2, 2017) ("the district court erred in declining to consider the exhibits attached to Reed's complaint"); <u>F.T.C. v. AbbVie Products LLC</u>, 713 F.3d 54, 63 (11th Cir. 2013) ("At the motion-to-dismiss stage, we consider the facts derived from a complaint's exhibits as part of the plaintiff's basic factual averments."); <u>Kinsey v. MLH Fin. Servs., Inc.</u>, 509 F. App'x 852, 853 (11th Cir. 2013) ("Exhibits that

are attached to a pleading are considered part of the pleading for all purposes.").

The City has also cited certified copies of public records in support of this Motion.  For example, the City cited:

- The lis pendens, (Doc. 17-12; Doc. 17-13; Doc. 17-14; Doc. 17-15; Doc. 17-31);

- The notices of intent to repair and demolish, (Doc. 17-16; Doc. 17-17; Doc. 17-18; Doc. 17-19);

- A municipal court record, (Doc. 17-20);

- Deeds, (Doc. 17-23; Doc. 17-24; Doc. 17-25; Doc. 17-26; Doc. 17-32);

- State court records, (Doc. 17-36; Doc. 17-37);

- City Ordinance 2015-03, (Doc. 17-38); and

- City council minutes, (Doc. 17-39, Doc. 17-40, Doc. 17-41, Doc. 17-42).

On a motion to dismiss, courts may take judicial notice of public records. See Halmos v. Bomardier Aerospace Corp., 404 F. App'x 376, 377 (11th Cir. 2010) ("We have held that a district court may take judicial notice of matters of public record without converting a Rule 12(b)(6) motion into a Rule 56 motion.").  The Court may also consider the ordinance and the lis pendens because the Amended Complaint incorporates them by reference.  See Doc. 2 at 3-4, ¶¶ 12-13; Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S. Ct. 1499, 2509 (2007) (holding that on motion to dismiss, courts may consider "documents incorporated into the complaint by reference").

The City has also cited the records of this Court from the Tisdales' first federal lawsuit against the City.  (Doc. 17-27; Doc. 17-28; Doc. 17-29; Doc. 17-30; Doc. 17-33; Doc. 17-34; Doc. 17-35; Doc. 17-44; Doc. 17-45.)  On a motion to dismiss, courts may take judicial notice of their own records.  See United States v. Rey, 811 F.2d 1453, 1457 (11th Cir. 1987) ("A court may take judicial notice of its own records and the records of inferior courts.").

The Court may also consider all of the exhibits described in this subsection under the motion-to-dismiss standard, because those exhibits are central to the Amended Complaint's allegations and their authenticity cannot be challenged.  See SFM Holdings, Ltd. v. Banc of Am. Secs., LLC, 600 F.3d 1334, 1337 (11th Cir. 2010) ("In ruling upon a motion to dismiss, the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged.").

Importantly, the exhibits supersede the Amended Complaint's factual allegations.  See F.T.C. v. AbbVie Products LLC, 713 F.3d 54, 63 (11th Cir. 2013) ("We . . . treat specific facts demonstrated by exhibits as overriding more generalized or conclusory statements in the complaint itself."); Simmons v. Peavy-Welsh Lumber Co., 113 F.2d 812, 813 (5th Cir. 1940) ("Where there is a conflict between allegations in a pleading and exhibits thereto, it is well settled that the exhibits control.").[7]

---

[7] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit entered before October 1, 1981.

The City contends that the Court has sufficient information to dismiss all of the Tisdales' claims under the motion-to-dismiss standard.  However, the City moves, in the alternative, for summary judgment on all claims.

**D.      The Summary Judgment Standard**

According to Rule 56 of the Federal Rules of Civil Procedure, "A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  "Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery."  Fed. R. Civ. P. 56(b).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that

> an adverse party cannot produce admissible evidence
> to support the fact.

Fed. R. Civ. P. 56(c)(1).

"After the moving party has met its burden of demonstrating the absence of any genuine issue of material fact, the non-moving party must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Co., 32 F.3d 520, 524 (11th Cir. 1994).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511 (1986) (internal citations omitted).

## E.   Analysis of the Claims

The Amended Complaint does not state a claim upon which relief can be granted, the Court lacks subject matter jurisdiction over any claim for injunctive relief, and the City is entitled to summary judgment on all claims.

1.    **The City is Entitled to Judgment as a Matter of Law on the Fourth Amendment Claim**

The City is entitled to judgment as a matter of law on the Fourth Amendment claim.[8]  Paragraphs 20 and 21 of the Amended Complaint purport to assert a Fourth Amendment claim against the City:

> 20. The City, by and through its agents, employees, and/or representatives, at all times relevant hereto, acted under its authority and under the color of state law.  The Tisdales bring suit against the City pursuant to 42 U.S.C. § 1983.

> 21. The Tisdales assert that Defendant violated their 4th Amendment rights by using the Andalusia Police Department to enter their private property without permission and over the Plaintiffs' objections under an alleged 'abatement' to facilitate a large lien against the Plaintiffs' property that it desires to take without compensation.

(Doc. 2 at 9, ¶¶ 20-21.)

The Fourth Amendment claim relates to building inspector Richard Moore's entry upon the property at 233 South Cotton Street on September 15, 2017, and to abatement work performed at 201 South Three Notch Street and 254 Historic Central Street in September 2017.   (Doc. 2 at 5-6, ¶ 13.)   Mr. Tisdale owns property at 233 South Cotton Street in his individual capacity. (Doc. 17-23.)  Tisdale Family Properties, Inc. owns the properties at 201 South Three Notch Street and 254 Historic Central Street.  (Doc. 17-25; Doc. 17-26.) Therefore, Tisdale Family Properties, Inc. cannot assert a Fourth Amendment claim based upon the inspection at 233 South Cotton Street, and Mr. Tisdale cannot assert a Fourth Amendment claim based upon the abatements at 201

---

[8] As explained <u>infra</u>, § III(E)(10), the Tisdales are also precluded from asserting their Fourth Amendment claim because they waived the right to assert it in a limitation of remedy clause.

South Three Notch Street and 254 Historic Central Street.   See Rakas v. Illinois, 439 U.S. 128, 134, 99 S. Ct. 421, 425 (1978) ("A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.").

In any event, these allegations do not state a municipal liability claim against the City.  "A local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  Monell v. Department of Soc. Servs., 436 U.S. 658, 694, 98 S. Ct. 2018, 2037-38 (1978).  Accordingly, "proper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation."  Collins v. City of Harker Heights, 503 U.S. 115, 120, 112 S. Ct. 1061, 1066 (1992).

"To impose section 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."  McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004).  As to the second and third steps, "[i]t is not enough for a § 1983 plaintiff merely to identify

conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged.  That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  Board of the Cnty. Comm'rs v. Brown, 520 U.S. 397, 404, 117 S. Ct. 1382, 1388 (1997).

The Fourth Amendment claim fails at the inception because it does not plausibly allege an underlying constitutional violation.  "In order for [Mr. Tisdale] to prevail on [his] Fourth Amendment claim, [he] must demonstrate that the seizure of [his] property was unreasonable."  Guettler v. City of Montgomery, No. 2:11-cv-573-WHA, 2012 WL 1987188, at *7 (M.D. Ala. June 4, 2012).  "A central factor relied on by courts . . . is whether the plaintiff was afforded procedural due process before losing his property."  Id.  "[C]ourts have analyzed whether a nuisance abatement was 'carried out' in a reasonable manner by examining whether the property owners were afforded procedural due process before the destruction of their property, and whether any other unreasonable or arbitrary municipal actions are shown."  Tribue v. Hough, No. 304CV286/RV/EMT, 2006 WL 42163, at 6 (N.D. Fla. Jan. 6, 2006).

In Freeman v. City of Dallas, 242 F.3d 642, 653 (5th Cir. 2001), the Fifth Circuit held that abatement procedures which "comport with due process suggests the Fourth Amendment reasonableness of the . . . remedial orders." In Santana v. City of Tulsa, 359 F.3d 1241, (10th Cir. 2004), the Tenth Circuit

held that "as long as procedural due process standards are met and no unreasonable municipal actions are shown, a nuisance abatement action does not violate the Fourth Amendment."  The Sixth and Eighth Circuits agree.  See Embassy Realty Invs., Inc. v. City of Cleveland, 572 F. App'x 339, 345 (6th Cir. 2014) ("Barnes had been afforded adequate due process relating to the condemnation proceedings and, therefore, the warrantless entrance on the Property to remediate the established nuisance was reasonable under the Fourth Amendment."); Samuels v. Meriwether, 94 F.3d 1163, 1168 (8th Cir. 1996) ("an abatement carried out in accordance with procedural due process is reasonable in the absence of any factors that outweigh governmental interests").  In the Middle District of Alabama, Judge Albritton previously declared that "a city inspector's actions are reasonable when he acts pursuant to city council order just as a law enforcement officer's actions are reasonable when acting on a warrant issued by a neutral magistrate."  Guettler v. City of Montgomery, No. 2:11-cv-573-WHA, 2012 WL 1987188, at *6 (M.D. Ala. June 4, 2012).

In this case, the City afforded procedural due process.  (Doc. 2-3.)  The City recorded, and served upon the Tisdales, Findings of Public Nuisance, Notices and Orders to Remedy, and Notices of Lis Pendens declaring each property a public nuisance and listing the reasons for that finding.  (Doc. 22-1 at 5, ¶ 7; Doc. 17-12; Doc. 17-13; Doc. 17-14; Doc. 17-15.)  The notices specified the date, time, and location that the city council would hold a public hearing for each property.  (Doc. 17-12 at 7-8, ¶ 11; Doc. 17-13 at 8-9, ¶ 11;

Doc. 17-14 at 6-7, ¶ 10; Doc. 17-15 at 7-8, ¶ 11.)  The notices also advised the Tisdales of their right to appeal an adverse decision.  (Doc. 17-12 at 7-8, ¶ 11; Doc. 17-13 at 8, ¶ 11; Doc. 17-14 at 7, ¶ 10; Doc. 17-15 at 8, ¶ 11.)  The City published notice of the hearings in the *Andalusia Star* newspaper.  (Doc. 22-1 at 5, ¶ 9.)

On February 16, 2016, the city council conducted separate public hearings for each property.  (Doc. 22-1 at 5, ¶ 10.)  Exhibit 39 is a certified copy of the minutes.  (Doc. 17-39.)  At each hearing, the City's director of Planning and Development and a consultant presented a Finding of Public Nuisance, Notice and Order to Remedy, and Notice of Lis Pendens, post-publication affidavit of legal notice in the *Andalusia Star* newspaper, proof of publication, and a detailed written report, including photographs.  (Doc. 17-39 at 9, 11, 13, 14.)  Mr. Tisdale appeared at each hearing and addressed the council.  (Doc. 22-1 at 5, ¶ 10; Doc. 17-39 at 11, 12, 14, 16.)  After each hearing, the council voted unanimously to declare each property a public nuisance and to proceed with the abatements, with the exception of the property at 233 South Cotton Street.  (Doc. 22-1 at 5-6, ¶ 10; Doc. 17-39 at 11, 13, 14, 16.)  For the property at 233 South Cotton Street, the city council continued the public hearing until March 1, 2016, to allow Mr. Tisdale time to propose a remediation agreement to officials in the City's Planning and Development Department.  (Doc. 22-1 at 6, ¶ 10; Doc. 17-39 at 16.)

Mr. Tisdale failed to propose a suitable agreement to the Planning and Development Department officials.  (Doc. 22-1 at 6, ¶ 11.)  On March 1, 2016,

the city council reconvened its public hearing regarding the property at 233 South Cotton Street. (Doc. 22-1 at 6, ¶ 11; Doc. 17-40.) Exhibit 40 is a certified copy of the minutes. (Doc. 17-40.) The city council voted unanimously to declare the property at 233 South Cotton Street a public nuisance and to proceed with the abatement, but allowed Mr. Tisdale until May 30, 2016, to take the remedial measures identified in the notice of *lis pendens* for that property. (Doc. 22-1 at 6, ¶ 11; Doc. 17-40 at 3, 5.) In other words, the council granted Mr. Tisdale an additional ninety days to remediate the property at 233 South Cotton Street. (Doc. 22-1 at 6, ¶ 11; Doc. 17-40 at 3.)

Section 5-107(c) of the Ordinance Concerning Unsafe Structures and Dangerous Buildings provided the Tisdales a right to appeal the council's decisions:

> Any person aggrieved by the decision of the Council at the hearing may, within ten (10) days thereafter, appeal to the Circuit Court of Covington County, Alabama, upon filing with the clerk of the Circuit Court of Covington County, Alabama, notice of the appeal and bond for security of costs in the form and amount to be approved by the Circuit Clerk.

(Doc. 17-38 at 12; Doc. 2-2 at 11.) The Tisdales did not exercise their right to appeal any of the city council's abatement decisions to the Covington County circuit court. (Doc. 22-1 at 6, ¶ 12.)

On April 29, 2016, the City served Tisdale Family Properties, Inc. notice of its intent to demolish the property located at 254 Historic Central Street. (Doc. 17-19; Doc. 22-1 at 6, ¶ 13.) On April 29, 2016, the City served Tisdale Family Properties, Inc. notice of its intent to repair the property located at 201 South Three Notch Street. (Doc. 17-18; Doc. 22-1 at 6, ¶ 13.) On April 29,

2016, the City served Mr. Tisdale notice of its intent to repair the property located at 233 South Cotton Street.  (Doc. 17-16; Doc. 22-1 at 6-7, ¶ 13.)  On April 30, 2016, the City served Mr. Tisdale and Jennifer H. Tisdale notice of its intent to demolish the property adjacent to 233 South Cotton Street.  (Doc. 17-17; Doc. 22-1 at 7, ¶ 13.)  With regard to the property at 233 South Cotton Street, the City stipulated that it would not proceed with the abatement until May 30, 2016, so as to allow Mr. Tisdale the additional ninety days to remediate the property, (Doc. 17-16 at 2, 6; Doc. 22-1 at 7, ¶ 13).

Although the ninety-day extension technically applied only to the property at 233 South Cotton Street, the City allowed the Tisdales the additional ninety days on all four properties.  (Doc. 22-1 at 7, ¶ 14.)  The Tisdales were aware of this informal extension.  (Doc. 17-27 at 3, ¶ 13.)

In the mediation settlement agreement, the City only agreed to forbear from taking abatement action, conditioned upon the Tisdales' performance of their obligations under that agreement: "Defendant agrees to forbear from taking abatement action on this property until July 1, 2017 . . . ."  (Doc. 2-9 at 3-6, ¶¶ 2, 3, 5, 6.)  The Tisdales acknowledged that the City was merely forbearing from taking action that was already legally authorized: "Plaintiffs hereby waive any objection to the delay in the abatement and agreed that Defendant's time for accomplishing the abatement shall be extended until October 1, 2017."  (Doc. 2-9 at 3-7, ¶¶ 2-3, 5-6.)

To be clear, the City had already completed the legal requirements to enter and abate the Tisdales' properties without the Tisdales' consent pursuant

to its Ordinance Concerning Unsafe Structures and Dangerous Buildings. (Doc. 2-2; Doc. 17-38.)  The Tisdales had failed to exercise their right to appeal the city council's abatement decisions to the Circuit Court of Covington County, Alabama.  (Doc. 22-1 at 6, ¶ 12; Doc. 2-2 at 11; Doc. 17-38 at 12.) Ultimately, the Tisdales did not meet their abatement deadlines for any of the properties and thereby breached the mediation settlement agreement.  (Doc. 22-1 at 8, ¶ 17.)

After the Tisdales missed their deadlines, the City was entitled to proceed with the abatements.  (Doc. 2-9 at 3, ¶ 2; Doc. 2-9 at 4, ¶ 3; Doc. 2-9 at 5-6, ¶ 5; Doc. 2-9 at 6-7, ¶ 6.)  The mediation settlement agreement set a deadline of October 1, 2017, for the City to complete its abatement work.  (Doc. 2-9 at 3-7, ¶¶ 2, 3, 5, 6.)  The ordinance authorized the appropriate municipal officials to enter to inspect, prevent violations, and carry out other orders issued pursuant to the ordinance.  (Doc. 2-2 at 3, § 5-101(c); Doc. 17-38 at 4, § 5-101(c).)  On each occasion, the City notified the Tisdales before it entered the property. (Doc. 2-10 at 2; Doc. 2-14 at 2.)  The Amended Complaint specifically alleges that the entries in question occurred "under an alleged 'abatement.'"  (Doc. 2 at 9, ¶ 21.)  The City completed the abatements by the October 1, 2017 deadline. (Doc. 22-1 at 13, ¶ 34.)

Regarding the property at 101 Pear Street, the City was not even required to provide a hearing, in light of the building's imminent danger of collapse:

> Notwithstanding the general proposition that a city must give an owner sufficient notice, an opportunity to be heard, and an opportunity to repair or demolish in order to properly exercise its police power in the destruction of a nuisance, courts have

recognized situations where the city can summarily destroy property without liability for a taking. See, e.g., Turpen v. City of St. Francisville, 145 Ill. App. 3d 891, 99 Ill. Dec. 616, 495 N.E.2d 1351 (1986); City of Chicago v. Garrett, 136 Ill. App. 3d 529, 91 Ill. Dec. 127, 483 N.E.2d 409 (1985); Leppo v. City of Petaluma, 20 Cal.App.3d 711, 97 Cal. Rptr. 840 (1971). In those situations where courts have allowed a city to summarily destroy nuisances without compensating the owner, the courts have generally found that an "emergency" exists such that the process due is not as encompassing as that necessary in the absence of such "emergency."

For example, in Leppo v. City of Petaluma, the city notified the owners of its finding that their building was unsafe due to widening cracks in the walls. The city also informed the owners of its intention to demolish the building and gave the owners a certain amount of time in which to destroy the building themselves. The city, however, did not give the owners a hearing on the question of immediate need for demolition. The court nevertheless found that if the city could establish by a preponderance of the evidence that an emergency actually existed, the city could dispense with a due process hearing and demolish the building summarily. Also, in Turpen v. City of St. Francisville, the court found that because the building in question was leaning toward the sidewalk, threatening to fall into the street, and was in a weakened condition, there existed such an emergency that the city was not required to adhere strictly to the notice requirements of the municipal code.

Blanchard v. City of Ralston, 4 Neb. App. 692, 703, 549 N.W.2d 652, 659 (1996), aff'd, 251 Neb. 706, 559 N.W.2d 735 (1997).

Alabama law specifically authorizes summary action in the case of an emergency:

Notwithstanding any other provisions of this chapter, a municipality shall have authority to enact, and may by ordinance authorize, the appropriate city official to initiate immediate repair or demolition of a building structure when, in the opinion of the official so designated, such emergency action is required due to imminent danger of structural collapse endangering adjoining property, the public right of way, or human life or health. The cost of the emergency action shall be fixed by the municipal governing body and shall be assessed as provided in the ordinance, or, if

such ordinance does not provide a method of assessment, as provided by this chapter.

Ala. Code § 11-53B-15 (1975).

Nevertheless, the City issued a Finding of Public Nuisance, Notice of Declaration of Emergency, and Notice of *Lis Pendens* regarding the 101 Pear Street building, (Doc. 17-31; Doc. 17-34 at 6-13), conducted a public hearing, (Doc. 17-41), and granted an extension, (Doc. 17-42), before it executed the abatement. Because the City afforded the Tisdales procedural due process for all of the properties in question, the abatements were reasonable and, therefore, comported with the Fourth Amendment.[9]

Not only do the Tisdales fail to establish an underlying constitutional violation, but they also do not identify a municipal custom or policy. "The threshold identification of a custom or policy 'ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality.' This prevents the imposition of liability based upon an isolated incident. Rather, the incident must result from a demonstrated practice." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004) (quoting Board of the Cnty Comm'rs v. Brown, 520 U.S. 397, 403-04, 117 S. Ct. 1382, 1388 (1997)) (internal punctuation and citations omitted).

"A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on

---

[9] The Tisdales are also precluded from claiming a lack of due process by virtue of their release of all due process claims in the mediation settlement agreement. (Doc. 2-9 at 2, ¶ 1.)

behalf of the municipality." <u>Sewell v. Town of Lake Hamilton</u>, 117 F.3d 488, 489 (11th Cir. 1997).  "A custom is a practice that is so settled and permanent that it takes on the force of law." <u>Sewell v. Town of Lake Hamilton</u>, 117 F.3d 488, 489 (11th Cir. 1997).   The Amended Complaint does not allege the existence of a custom or policy of conducting unlawful searches or seizures. (Doc. 2.)   For all of these reasons, the Court should dismiss the Fourth Amendment claim and grant summary judgment to the City.

### 2.    The City is Entitled to Judgment as a Matter of Law on the Fifth Amendment Equal Protection Claim

In the heading of Count I, (Doc. 2 at 9), and again in paragraph 28 of Count I, (Doc. 2 at 11, ¶ 28), the Amended Complaint makes a passing reference to the Fifth Amendment to the U.S. Constitution.   Paragraph 28 refers to "equal protection under the law, in violation of . . . the . . . Fifth . . . Amendment."  (Doc. 2 at 11, ¶ 28.)  The Amended Complaint does not state a Fifth Amendment equal protection claim upon which relief can be granted.[10]

The Fifth Amendment does not contain an equal protection clause.  U.S. Const. amend. V.  "[T]he principles of equal protection are applied to the federal government through the Due Process Clause of the Fifth Amendment." <u>Swisher Int'l, Inc. v. Schafer</u>, 550 F.3d 1046, 1060 (11th Cir. 2008).  "The Fifth Amendment's due process clause applies only to the federal government."

---

[10] The Tisdales are also precluded from asserting a Fifth Amendment equal protection claim because they have released that claim, they have waived the right to assert that claim, and that claim is barred by the doctrine of *res judicata*, or claim preclusion.  (<u>See</u>, <u>infra</u>, § III(E)(8), -(9), -(10).)

<u>Young v. City of Mobile</u>, No. CIV.A. 13-00586, 2014 WL 5488827, at *4 (S.D. Ala. Oct. 29, 2014) (Dubose, J.).

"The Fifth Amendment obviously does not apply here – the acts complained of were committed by state rather than federal officials." <u>Riley v. Camp</u>, 130 F.3d 958, 972 (11th Cir. 1997). The Court should dismiss the Fifth Amendment claim for failure to state a claim upon which relief can be granted.

### 3. The City is Entitled to Judgment as a Matter of Law on the Fourteenth Amendment Equal Protection Claim

The City is entitled to judgment as a matter of law on the Fourteenth Amendment equal protection claim. The Amended Complaint asserts a "class of one" equal protection claim. (Doc. 2 at 9, ¶ 22.) "To prevail on a 'class of one' equal protection claim, Plaintiffs must show they were intentionally treated differently from others who were 'similarly situated' and there is no rational basis for the difference in treatment." <u>Grider v. City of Auburn</u>, 618 F.3d 1240, 1263-64 (11th Cir. 2010). "To be 'similarly situated' the comparators must be '*prima facie identical in all relevant respects.*'" <u>Id.</u> at 1264 (quoting <u>Griffin Indus., Inc. v. Irvin</u>, 496 F. 3d 1189, 1204 (11th Cir. 2007)). "[E]stablishing a 'class of one' equal protection claim can be an onerous task, and properly setting forth a 'class of one' claim should not be regarded as a perfunctory matter." <u>Leib v. Hillsborough Cnty. Pub. Trans. Comm'n</u>, 558 F.3d 1301, 1307

(11th Cir. 2009).  The Amended Complaint does not demonstrate a "class of one" equal protection claim.[11]

### a. The Tisdales Were Not Intentionally Treated Differently from Others Similarly Situated by a Final Policymaker

The Tisdales were not intentionally treated differently from others similarly situated by a final policymaker of the City.  First, the Tisdales' comparators are not "prima facie identical in all relevant respects."  Campbell v. City of Rainbow City, 434 F.3d 1306, 1314 (11th Cir. 2006).  "Governmental decisionmaking challenged under a 'class of one' equal protection theory must be evaluated in light of the full variety of factors that an objectively reasonable governmental decisionmaker would have found relevant in making the challenged decision."  Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1203 (11th Cir. 2007).  "[W]hen plaintiffs in 'class of one' cases challenge the outcome of complex, multi-factored government decisionmaking processes, similarly situated entities 'must be very similar indeed.'"  Griffin, 496 F.3d at 1205 (quoting McDonald v. Village of Winnetka, 371 F.3d 992, 1002 (7th Cir. 2004)).

The case law illustrates the high degree of similarity required to establish a similarly situated comparator.  In the zoning case Campbell v. Rainbow City, the Eleventh Circuit refused to consider comparator properties that were subject to a different use than the plaintiffs' property: "Because the Campbells sought to build a large residential complex, it would be in error for the court to

---

[11] The Tisdales are also precluded from asserting a Fourteenth Amendment equal protection claim because they have released that claim, they have waived the right to assert that claim, and that claim is barred by the doctrine of res judicata, or claim preclusion.  (See, infra, § III(E)(8), -(9), -(10).)

consider commercial developments." 434 F.3d 1306, 1315 (11th Cir. 2006). In this case, the Tisdales offer residential and governmental properties as comparators, even though none of the Tisdales' properties are residential or governmental. (Doc. 2 at 7-8, ¶ 17.) Those comparators fail at the inception. See Campbell, 434 F.3d at 1315.

Of the remaining comparators:

a) The City initiated abatement measures on two of them before the Tisdales even filed their first federal court lawsuit, (Doc. 22-1 at 18-19, ¶¶ 44, 46);

b) One obtained a permit, made repairs, and passed inspection before the Tisdales filed their first federal court lawsuit, (Doc. 22-1 at 18, ¶ 43);

c) One is under new ownership, and the new owner is making repairs, (Doc. 22-1 at 19, ¶ 45);

d) The City has ongoing abatement negotiations with one; (Doc. 22-1 at 19, ¶ 47); and

e) One was renovated and re-roofed in the 2000's and is generally in good condition, except for damage to a corner column of the walkway canopy caused by a vehicular accident, (Doc. 22-1 at 19-20 ¶ 49).

All of these comparators fail for lack of similarity. "A showing that two projects were similarly situated requires some specificity." Campbell v. Rainbow City, 434 F.3d 1306, 1314 (11th Cir. 2006). "Different treatment of dissimilarly situated persons does not violate the equal protection clause." E&T Realty v. Strickland, 830 F.2d 1107, 1109 (11th Cir. 1987). The Amended Complaint conclusorily alleges that the remaining comparators have "major structural issues" or are "in similar or worse condition" than the Tisdales' properties, (Doc. 2 at 8, ¶ 17), but the Tisdales cannot demonstrate that those

68

comparators are "prima facie identical in all relevant respects" to their properties.  Campbell v. City of Rainbow City, 434 F.3d 1306, 1314 (11th Cir. 2006).  "[E]ven in run-of-the-mill discrimination cases, we have emphasized that plaintiffs are not permitted to 'rely on broad generalities in identifying a comparator.'"  Leib v. Hillsborough Cnty. Publ. Transp. Comm'n, 558 F.3d 1301, 1307 (11th Cir. 2009) (quoting Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1204 (11th Cir. 2007)).

Even if the Court evaluates this Motion strictly under the motion-to-dismiss standard, the City is still entitled to dismissal.  The Amended Complaint does not plead factual allegations which plausibly demonstrate that the comparators it identifies are "prima facie identical in all relevant respects" to the Tisdales' properties.  Campbell v. City of Rainbow City, 434 F.3d 1306, 1314 (11th Cir. 2006).  The defects in the Tisdales' properties are vast.  (Doc. 2-3.)

As to the lot adjacent to 233 South Cotton Street, the City found that the property contains "an accumulation of rail road cars, rail road equipment, and various other kinds of equipment, building materials, building debris, weeds, and similar items."  (Doc. 2-3 at 6.)  The City determined that the "rail cars are an attractive nuisance to children, vagrants, criminal, or immoral persons and will have to be removed."  (Doc. 2-3 at 6.)  The City identified the need to "[r]emove or cut all vegetation overgrowth, grass and weeds [from] the property."  (Doc. 2-3 at 6.)  The City also identified the need to "[r]emove all deteriorated structures that are on the property, remove any scrap, junk,

rubbish, building materials and building debris, [and] restore structure site and property to a safe condition after removal." (Doc. 2-3 at 6.) The City determined the property is "unsafe" and that it presents a "blighting effect . . . on the surrounding area." (Doc. 2-3 at 7.) The Amended Complaint does not allege the existence of any comparator that is "prima facie identical" to the lot adjacent to 233 South Cotton Street and is treated differently. See Campbell, 434 F.3d at 1314.

As to the property at 254 Historic Central Street, the City identified four separate structures on the property that were in need of demolition. (Doc. 2-3 at 12.) The City noted that "[t]he property has become a dump site with building debris from other properties." (Doc. 2-3 at 12.) The City identified the need to "[r]emove all deteriorated structures that are on the property." (Doc. 2-3 at 13.) Specifically, the City determined that "structure[s] that have roofs that are collapsed or partial[ly] collapsed, walls that have mortar and/or brick that have eroded, cracked, collapsed or partially collapsed, are to be demolished and removed from the property." (Doc. 2-3 at 13.) The City determined that the property is "unsafe" and that it presents a "blighting effect . . . on the surrounding area." (Doc. 2-3 at 13.) The Amended Complaint does not allege the existence of any comparator that is "prima facie identical" to the property at 254 Historic Central Street and is treated differently. See Campbell, 434 F.3d at 1314.

The property at 233 South Cotton Street is a former train depot. (Doc. 2-3 at 19.) The City identified the need to "[r]emove all deteriorated structures"

from the property.  (Doc. 2-3 at 20.)  The City declared that "[t]he long wood structure off the back of the brick building is to be demolished and the structure site made safe."  (Doc. 2-3 at 19-20.)  The City identified the need to remove "[t]he building materials, building debris, weeds, and similar items" and to remove "all wood, iron parts and equipment left on the property from the train depot and its functions."  (Doc. 2-3 at 20.)  The City identified the need to remove graffiti from the brick building.  (Doc. 2-3 at 20.)  The City determined that "[t]he roof of the brick building is to be repaired to be weather tight so as to not admit rain to cause or continue to cause decay."  (Doc. 2-3 at 20.)  The City also identified the need to repair all windows and doors to ensure they are "in sound condition and weather tight."  (Doc. 2-3 at 20.)  The City identified the need to restore the building site to a safe condition.  (Doc. 2-3 at 20.)  The Amended Complaint does not allege the existence of any comparator that is "prima facie identical" to the property at 233 South Cotton Street and is treated differently.  See Campbell, 434 F.3d at 1314.

Regarding the property at 201 South Three Notch Street, the City determined that the "vacant building" is "an attractive nuisance to children, vagrants, criminals, or immoral persons."  (Doc. 2-3 at 26.)  The City identified the need to "[s]ecure all doors and openings as to not allow entry to any such persons."  (Doc. 2-3 at 26.)  The City noted "missing windows" and determined that window openings required covering and sealing.  (Doc. 2-3 at 25-26.)  The City identified the need to "[r]eplace down spouts and connect to an appropriate drain discharge source," as well as to "[r]epair the roof drains to a

condition so as to not allow rain admittance into cornice work and to ensure proper discharge of all water runoff of the roof." (Doc. 2-3 at 26.) The City identified the need to "[s]ecurely fasten all down spouts to the building." (Doc. 2-3 at 26.) The City identified the need to "[r]eplace any rusted or corroded metal, rotten or decaying wood on the cornice, replace down spouts and repair roof drains." (Doc. 2-3 at 25.) "[M]ortar and masonry joints damaged around the down spouts and on the parapet wall" required repair. (Doc. 2-3 at 25.) The City identified the need to "[r]emove any vegetation growing on or from under the building." (Doc. 2-3 at 26.) The City identified the need to "[r]eplace all rotten or decaying wood on the exterior doors, door jambs, window trim, decoration, and the transom above the newly installed door, on the first level." (Doc. 2-3 at 25.) The City identified the need to "[p]rotect all exterior wood that is not decay resistant with proper coating to ensure no continued decay." (Doc. 2-3 at 25.) The City determined the property is "unsafe" and that it presents a "blighting effect . . . on the surrounding area." (Doc. 2-3 at 26-27.) The Amended Complaint does not allege the existence of any comparator that is "prima facie identical" to the property at 201 South Three Notch Street and is treated differently. See Campbell, 434 F.3d at 1314.

As to the property at 101 Pear Street, the City determined that an imminent danger existed in the form of "unstable exterior masonry walls." (Doc. 17-31 at 2.) A letter dated June 27, 2012, from structural engineer Danny P. Raines documented "the extreme state of deterioration of the timber roof and 2nd and 3rd floors" of the building at 101 Pear Street. (Doc. 17-34 at

2.)  According to Mr. Raines's letter, "[t]he north approximately one-third of the roof framing of the building ha[d] collapsed."  (Doc. 17-34 at 3.)  "The parapet wall on the east side of the structure near the north end appear[ed] to be damaged and deteriorated."  (Doc. 17-34 at 3.)  "The exterior load bearing clay masonry walls of the building [were] exhibiting moderate deterioration with some areas exhibiting extensive deterioration."  (Doc. 17-34 at 3.)  Mr. Raines opined "that the timber framing of the subject building is in very poor condition and should be removed to prevent damage to the exterior load bearing walls."  (Doc. 17-34 at 3.)  Mr. Raines further recommended that "[a]s the framing is removed, temporary shoring or permanent bracing should be installed to replace the bracing that was provided by the roof and 2nd floor framing."  (Doc. 17-34 at 3.)  Mr. Raines warned that "[t]he damaged parapet located on the east wall near the north end could present a falling debris hazard for pedestrians and should be removed or repaired immediately."  (Doc. 17-34 at 3.)  A letter dated August 10, 2016, from structural engineer Bradley B. Johnson found that "the roof and floors on approximately the northern one-third of the building ha[d] been demolished, along with a wood framed bay window that existed on the east wall of the building at the third floor level."  (Doc. 17-34 at 4.)  Mr. Johnson warned that "[t]he removal of the wood framed floor and roof systems from the northern portion of the building ha[d] rendered the remaining exterior walls at these locations structurally unstable against lateral loads (wind loads)."  (Doc. 17-34 at 4.)

Mr. Johnson had advised that "the existing brick masonry walls of the building in the area where the roof and floors were removed should be immediately braced in order to be made structurally stable." (Doc. 17-34 at 4.) Despite Mr. Johnson's call for immediate bracing, the exterior masonry walls remained unstable when the City issued its Finding of Public Nuisance, Notice of Declaration of Emergency, and Notice of *Lis Pendens* on September 1, 2016. (Doc. 17-31 at 2; Doc. 17-31 at 8, ¶ 2.)

Mr. Tisdale's own attorney acknowledged that the property at 101 Pear Street had been in its then-present condition "for many months." (Doc. 17-34 at 15, ¶ 3.)   A letter from engineer David C. Jones found that "[t]he previous wood-framed floor and roof systems of the three-story structure had been removed." (Doc. 17-34 at 17.)  Mr. Jones determined that "with the floor and roof framing systems removed, the three perimeter walls of the northern portion of the structure are not laterally braced." (Doc. 17-34 at 17.)   Mr. Jones warned that "the natural stability of these components would not likely be able to successfully resist wind pressures associated with a severe windstorm or hurricane without structural damage or collapse." (Doc. 17-34 at 18.)

Mr. Jones also expressed an "immediate structural concern" for the "unsupported edge conditions of the third floor walls at the center of the east elevation of the structure where a bay window [had] previously been removed." (Doc. 17-34 at 18.)   Mr. Jones warned that "[n]o continuity of the wall construction exists as the head over the bay window opening is also missing,

leaving the northern and southern portions of the wall unsupported and further reducing the strength/rigidity of the multi-wythe brick walls either side of the vacant window opening." (Doc. 17-34 at 18.) The Amended Complaint does not allege the existence of any comparator that is "prima facie identical" to the property at 101 Pear Street and is treated differently. See Campbell, 434 F.3d at 1314.

The Amended Complaint also does not plausibly demonstrate that any allegedly disparate treatment was intentional on the part of the city council. See Maverick Enters. LLC v. Frings, 456 F. App'x 870, 872 (11th Cir. 2012) ("In order to establish a *prima facie* case in a 'class of one' equal protection claim, the plaintiff must demonstrate *intentional* disparate treatment") (emphasis added). To hold the City liable for an equal protection violation, the Tisdales must show that the final policymaker, in this case the city council, intentionally discriminated against them.[12] See City of St. Louis v. Praprotnik, 485 U.S. 112, 123, 108 S. Ct. 915, 924 (1988) ("only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability"); Campbell v. Rainbow City, 434 F.3d 1306, 1313 (11th Cir. 2006) ("In order to find that the City is liable for such an alleged tort, however, we must find that the Planning Commission, the final policy maker, acted with the improper motive."). The Tisdales allege that animosity existed between the mayor and them, (Doc. 2 at 8-9, ¶ 18), but the allegation of an improper motive by the mayor, standing alone, does not state a claim. See

---

[12] Section 5-107(b) of Ordinance 2015-03 makes the city council the final policymaker. (Doc. 2-2 at 11; Doc. 17-38 at 12.)

Campbell, 434 F.3d at 1313 ("An improper motive of one of the members of a nine-member Planning Commission is not imputed to the rest of the Commission."); see also Matthews v. Columbia Cnty., 294 F.3d 1294, 1297 (11th Cir. 2002) ("An unconstitutional motive on the part of one member of a three-member majority is insufficient to impute an unconstitutional motive to the Commission as a whole."); Mason v. Village of El Portal, 240 F.3d 1337, 1339 (11th Cir. 2001) ("[T]he critical issue on appeal is whether the alleged racially discriminatory motive of only one member of a three-member majority of a five-member council can give rise to municipal liability. We agree with the trial court that it does not."). In any event, the mayor played no role in the selection of the Tisdales' properties for abatement. (Doc. 22-1 at 17, ¶ 41.)

The Amended Complaint does not allege that any members of the city council were aware of the existence of any "prima facie identical" comparators to the Tisdales' properties, or that the city council otherwise intentionally subjected the Tisdales to disparate treatment. (Doc. 2.) Accordingly, the Amended Complaint does not state an equal protection claim upon which relief can be granted. See Barth v. McNeely, No. 8:14-CV-00118-EAK, 2014 WL 3101348, at *5 (M.D. Fla. July 7, 2014) ("The Court finds that the Plaintiff only offers conclusory allegations with no clear factual support of disparate treatment. Therefore Plaintiff fails to state a claim for a violation of Equal Protection."), aff'd, 603 F. App'x 846 (11th Cir. 2015), cert. denied, 136 S. Ct. 217, 193 L. Ed. 2d 130 (2015).

Controlling Eleventh Circuit precedent requires courts to scrutinize "class of one" equal protection claims rigorously.   See Leib v. Hillsborough Cnty. Pub. Transp. Comm'n, 558 F.3d 1301, 1307 (11th Cir. 2009) ("the 'similarly situated' requirement must be rigorously applied in the context of 'class of one' claims"); Griffin Indus., Inc. v. Irvin, 496 F.3d 1189 (11th Cir. 2007) ("To maintain this focus on discrimination, and to avoid constitutionalizing every state regulatory dispute, we are obliged to apply the 'similarly situated' requirement with rigor.").   The Amended Complaint does not state an equal protection claim, and the City is entitled to summary judgment, based on the Tisdales' failure to plausibly demonstrate that they were intentionally treated differently than similarly situated persons by a final policymaker.   See Leib v. Hillsborough Cnty. Pub. Transp. Comm'n, 558 F.3d 1301, 1307 (11th Cir. 2009) ("Given the complaint's complete lack of factual detail regarding the 'similarly situated' requirement, Leib's 'class of one' claim was properly dismissed.").

### b.   *The Tisdales Cannot Demonstrate the Absence of a Rational Basis for the City's Actions*

The Tisdales also cannot show the absence of a rational basis for the City's actions.   The Tisdales do not even allege that the City lacked a rational basis for pursuing the abatements.   (Doc. 2.)   "[L]ike complaints in all other cases, complaints in § 1983 cases must . . . 'contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.'"   Randall v. Scott, 610 F.3d 701, 707 n.2 (11th

77

Cir. 2010) (quoting Bryson v. Gonzalez, 534 F.3d 1282, 1286 (10th Cir. 2008)). An essential element of a "class of one" equal protection claim is "that there is no rational basis for the difference in treatment." Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S. Ct. 1073, 1074 (2000). "This standard is objective – if there is a reasonable justification for the challenged action, we do not inquire into the government actor's actual motivations." Kansas Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1216 (10th Cir. 2011). Under controlling Eleventh Circuit precedent, an equal protection claim must be dismissed when the "complaint does not, on its face, meet the second prong of its 'class of one' claim – the requirement that there be no rational basis for the difference in treatment." Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1207 (11th Cir. 2007).

The *degree* of a property's deficiencies is a highly pertinent factor for assessing rationality. In Campbell, the Eleventh Circuit held a property was not a valid comparator when it "did not require the same, or as many variances as were sought with respect to Plaintiffs' proposed project." Campbell, 434 F.3d at 1316. In the zoning context, the Eleventh Circuit held, "[i]t is rational that a zoning board would be less likely to grant a variance to a development *that would violate a zoning ordinance like the density requirement to a greater degree*." Campbell, 434 F.3d at 1316 n.8 (emphasis added). In this case, the Tisdales have not shown that any comparators manifested the same degree of deficiencies as their properties. (Doc. 2.) The council minutes and notices of intent to repair and demolish, along with the findings attached to those

notices, demonstrate an objective rational basis for the abatements.  (Doc. 2-3; Doc. 17-16; Doc. 17-17; Doc. 17-18; Doc. 17-19; Doc. 17-39; Doc. 17-40; Doc. 17-41; Doc. 17-42.)   Accordingly, the Court should dismiss the Fourteenth Amendment equal protection claim.

### 4.   The City is Entitled to Judgment as a Matter of Law on the Breach of Contract Claim

The City is entitled to judgment as a matter of law on the breach of contract claim.  (Doc. 2 at 11, ¶¶ 30-32.)  Paragraph 31 of the Amended Complaint conclusorily alleges that the City "breached its contract with the Plaintiffs."  (Doc. 2 at 11, ¶ 31.)  Paragraph 32 clarifies that "Plaintiffs were not provided an opportunity to have their architect present to dispute any findings by the City's inspector and have been sent a letter wherein findings were made against the Plaintiffs."  (Doc. 2 at 11, ¶ 32.)  The Tisdales attached a copy of the letter as an exhibit to the Amended Complaint.  (Doc. 2-14.)

That letter is dated September 15, 2017, and it states that the inspection was performed "this morning."  (Doc. 2-14 at 2, ¶ 1.)  Therefore, these events occurred *after* Plaintiffs missed their deadlines to remedy the defects at 233 South Cotton Street.  (Doc. 2-9 at 3, ¶ 2.)  By September 2017, the City was "entitled to proceed with abatement of the property as provided in City Ordinance number 2015-03."  (Doc. 2-9 at 3, ¶ 2.)  Among other things, Ordinance 2015-03 provides inspection authority for city officials:

> Upon presentation of the proper credentials, an Appropriate Municipal Official may enter any building, structure, part of building or structure, party wall, foundation, or premises for the

purpose of inspection, to prevent violation of the provisions of this Article, and/or to carry out an order given pursuant to this Article.

(Doc. 2-2 at 3, § 5-101(c); Doc. 17-38 at 4, § 5-101(c).)

The mediation settlement agreement's provision for preliminary inspections was no longer operative because it only existed "to allow Plaintiffs an opportunity to cure any deficiencies before the July 1, 2017 deadline." (Doc. 2-9 at 7, ¶ 7.)  In any event, that provision in question did not require the City to accommodate the schedule of the Tisdales' architect or engineer, (Doc. 2-9 at 7, ¶ 7), and the Tisdales' own exhibits show that city attorney Mark Christensen notified the Tisdales' attorney that the City would "welcome" the Tisdales to send their architect or engineer to the inspections.  (Doc. 2-10 at 2; Doc. 2-14 at 2.)  An email attached to the Amended Complaint proves that the Tisdales' representative did not attend the inspections on September 15 and September 19 because he was not available: "September 22nd . . . is the first date our guy is available."  (Doc. 2-10 at 1.)  For all of these reasons, the Amended Complaint does not state a claim for breach of contract upon which relief can be granted, and the City is entitled to summary judgment on the breach of contract claim.

### 5. The City is Entitled to Judgment as a Matter of Law on the RICO Claim

Count Three purports to assert a claim against the City under the federal Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq.  (Doc. 2 at 11-12, ¶¶ 33-36)  The RICO claim is not viable for numerous reasons.  First, "[t]he Supreme Court has made it crystal clear that

80

the racketeering enterprise and the defendant must be two separate entities." Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1355 (11th Cir. 2016). "For example, a corporation and its officers, employees, or agents cannot constitute a RICO enterprise when the agents and employees are alleged to have acted within the scope of their responsibilities for the corporation." Carden v. Town of Harpersville, No. 2:15-cv-01381-RDP, 2017 WL 4180858, at *7 (N.D. Ala. Sept. 21, 2017). The Tisdales have not identified two separate entities.

Second, a governmental entity cannot form the *mens rea* necessary for the underlying criminal act necessary to support a civil RICO claim. See Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist., 786 F.3d 400, 412 (5th Cir. 2015); Call v. Watts, 142 F.3d 432 (6th Cir. 1998); Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist., 940 F.2d 397, 404 (9th Cir. 1991); Pine Ridge Recycling, Inc. v. Butts Cnty., 855 F. Supp. 1264, 1273-74 (M.D. Ga. 1994); Biondolillo v. City of Sunrise, 736 F. Supp. 258, 260-61 (S.D. Fla. 1990).

Third, a RICO claim requires a plaintiff to plausibly allege "at least two acts of racketeering activity the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." Lehman v. Lucom, 727 F.3d 1326, 1330 (11th Cir. 2013) (citation and internal punctuation omitted). The Amended Complaint summarily alleges that the City committed wire fraud in violation of 18 U.S.C. § 1343 and mail fraud in violation of 18 U.S.C. § 1341. (Doc. 2 at 11, ¶ 34.)

The federal wire fraud statute states:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of

false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.  If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1343 (Westlaw 2017).

The federal mail fraud statute states:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.  If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1341 (Westlaw 2017).

The Amended Complaint does not plead factual allegations which plausibly demonstrate either offense, and there is no evidence of such. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'") (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)).

Moreover, Rule 9(b) of the Federal Rules of Civil Procedure requires a plaintiff to plead fraud with particularity: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." This particularity requirement also applies to RICO claims:

> Because Plaintiffs' section 1962(c) claim is based on an alleged pattern of racketeering consisting entirely of the predicate acts of mail and wire fraud, their substantive RICO allegations must comply not only with the plausibility criteria articulated in Twombly and Iqbal but also with Fed. R. Civ. P. 9(b)'s heightened pleading standard, which requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

American Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1291 (11th Cir. 2010). Neither the Amended Complaint's factual allegations, nor the Tisdales' evidentiary submissions, satisfy either requirement. Accordingly, the Court should dismiss the RICO claim for failure to state a claim or, in the alternative, grant summary judgment for the City.

### 6.   The City is Entitled to Judgment as a Matter of Law on the RICO Claim for Treble Damages

The City is also entitled to judgment as a matter of law on Count Four's claim for treble damages under RICO.  (Doc. 2 at 12, ¶¶ 37-38.)  In addition to the reasons explained in the preceding subsection of this Response, (see, supra, § III(E)(5)), the treble damages claim also fails because the treble damages mandated by 18 U.S.C. § 1964(c) are punitive in nature, and governmental entities are immune from punitive damages.  See Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist., 786 F.3d 400, 412 (5th Cir. 2015); Pine Ridge Recycling, Inc. v. Butts Cnty., 855 F. Supp. 1264, 1273-74 (M.D. Ga. 1994).  The Court should dismiss the RICO treble damages claim for failure to state a claim upon which relief can be granted or, in the alternative, grant summary judgment for the City.

### 7.   The City is Entitled to Judgment as a Matter of Law on the Civil Conspiracy Claim

The City is entitled to judgment as a matter of law on Count Five's civil conspiracy claim.  (Doc. 2 at 12-13, ¶¶ 39-41.)  The intracorporate conspiracy doctrine bars the civil conspiracy claim.  See Grider v. City of Auburn, 618 F.3d 1240, 1261 (11th Cir. 2010) ("Under the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves.").

To the extent that the Tisdales seek to hold the City liable for a conspiracy under federal law, their civil conspiracy claim also fails for lack of an underlying constitutional violation, see Graves v. Thomas, 450 F.3d 1215,

1218 (10th Cir. 2006) ("a municipality may not be held liable where there was no underlying constitutional violation by any of its officers"), and for lack of a policy or custom underlying the conspiracy, see Weiland v. Palm Beach Cnty. Sheriff's Office, 792 F.3d 1313, 1328 (11th Cir. 2015) ("While this Court has never had occasion to hold that a conspiracy claim against a municipality must include the existence of a policy or custom underlying the conspiracy, that has to be so.") (citing Monell v. Department of Soc. Servs., 436 U.S. 658, 691, 98 S. Ct. 2018, 2036 (1978)).

Finally, "the pleading must provide more than 'mere conclusory statements' alleging a conspiracy." Grider v. Cook, 590 F. App'x 876, 881 (11th Cir. 2014). "It is not enough to simply aver in the complaint that a conspiracy existed." Fullman v. Graddick, 739 F.2d 553, 557 (11th Cir. 1984). In this case, the Amended Complaint summarily alleges that "[a]t all times material hereto, Defendants [sic] combined, confederated and conspired to do the acts against the Plaintiffs as set forth above." (Doc. 2 at 12, ¶ 40.) That conclusory allegation does not state a civil conspiracy claim upon which relief can be granted. For all of these reasons, the Court should dismiss the civil conspiracy claim for failure to state a claim upon which relief can be granted or, in the alternative, grant summary judgment for the City.

### 8.     The Doctrine of Res Judicata, or Claim Preclusion, Bars Most of the Tisdales' Claims

The doctrine of *res judicata*, or claim preclusion, bars all of the Tisdales' claims, except the Fourth Amendment claim and the breach of contract claim. The doctrine contains four elements:

> Under Eleventh Circuit precedent, a claim will be barred by prior litigation if all four of the following elements are present: (1) there is a final judgment on the merits; (2) the decision was rendered by a court of competent jurisdiction; (3) the parties, or those in privity with them, are identical in both suits; and (4) the same cause of action is involved in both cases.

Ragsdale v. Rubbermaid, Inc., 193 F.3d 1235, 1238 (11th Cir. 1999).

These elements are clearly satisfied as to the Fifth and Fourteenth Amendment equal protection claims.  In their first federal lawsuit, the Tisdales asserted the same claims against the same defendant and requested the same relief. (Doc. 17-27.)  In fact, the Tisdales appear to have retyped the allegations of their first federal court complaint into the Amended Complaint verbatim. (Compare Doc. 17-27 at 6-8, ¶¶ 20-27 to Doc. 2 at 9-11, ¶¶ 20-28.)  The Tisdales dismissed those claims with prejudice on December 20, 2016.  (Doc. 17-29.)  This Court entered an order acknowledging the dismissal of those claims with prejudice.  (Doc. 17-30.)  Accordingly, the doctrine of *res judicata*, or claim preclusion, bars the Fifth and Fourteenth Amendment claims, including any request for injunctive relief.  See Franklin v. Williams, No. 2:10CV11-MEF, 2010 WL 992618, at *2 (M.D. Ala. Jan. 8, 2010) ("The dismissal with prejudice of plaintiff's claims against Williams and Greyhound Bus Lines pursuant to the stipulation of the parties operates as an

adjudication on the merits for purposes of claim preclusion."), <u>report and recommendation adopted</u>, No. 2:10-CV-11-MEF WO, 2010 WL 992619 (M.D. Ala. Mar. 16, 2010).

The preclusion bar also extends to the RICO, treble damages, and civil conspiracy claims. (Doc. 2 at 11-13, ¶¶ 33-41.)  "[C]laims are part of the same cause of action for res judicata purposes when they arise out of the same transaction or series of transactions."  <u>In re Piper Aircraft Corp.</u>, 244 F.3d 1289, 1296-97 (11th Cir. 2001).  The Tisdales' RICO, treble damages, and civil conspiracy claims arise out of the same series of events as the claims alleged in their first federal lawsuit. (Doc. 17-27.)  Therefore, the doctrine of *res judicata*, or claim preclusion, also bars the RICO, treble damages, and civil conspiracy claims.  <u>See</u> <u>Lary v. Ansari</u>, 817 F.2d 1521, 1523 (11th Cir. 1987) ("Although styled as a RICO claim, the complaint here relies on the same allegations of misconduct . . . as did the prior suit.  The present action . . . is therefore barred by res judicata.").

### 9.      The Tisdales Have Released Most of Their Claims

The Tisdales have also released all of their claims against the City, except their Fourth Amendment claim and their breach of contract claim.  In the mediation settlement agreement, the Tisdales agreed as follows:

> Plaintiffs hereby fully release and acquit and forever discharge the City of Andalusia, Alabama, and all of its present and former employees, agents, officers, elected officials, and appointed officials, in their individual and official capacities, and their heirs, executors, administrators, officers, employees, servants, agents, successors, assigns, employers, supervisors, attorneys, any persons or entities who have acted on behalf of or at the request of

said Releasees, and any persons or entities who controlled, directed, supervised, or trained said Releasees, or who were controlled, directed, supervised, or trained by such Releasees, and all other persons and entities of whatever kind or character from any and all rights, claims, actions, causes of action, demands, damages, costs, declaratory relief, equitable relief, injunctive relief, expenses, and attorneys' fees, of any kind whatsoever, whether statutory or common law, whether based in state or federal law, which Plaintiffs now have or may hereinafter accrue, known or unknown, now existing or that might arise in the future, directly or indirectly attributable to the alleged conduct of Defendant and/or Releasees, including any claims for any act, intentional act, error or omission, including deprivation of equal protection, deprivation of due process, taking, malicious prosecution, trespass, unconstitutional search or seizure, outrage, other violation of the state or federal constitution, and any other cause of action, whatsoever, which was alleged in that certain aforementioned litigation filed in the United States District Court for the Middle District of Alabama, Northern Division, Civil Action Number 2:16-cv-00387-WKW-SRW. Notwithstanding the foregoing, this release shall not apply to any claims asserted in the lawsuit styled John W. Tisdale, Jr. v. City of Andalusia, which is pending in the Circuit Court of Covington County as case number 23-CV-2016-000021.00, with respect to the property located at 101 Pear Street, Andalusia, Alabama.

(Doc. 2-9 at 2, ¶ 1.)

"Settlement agreements are highly favored by the courts as an amicable method of resolving disputes and promoting judicial economy." Oaks v. City of Fairhope, 515 F. Supp. 1004, 1032 (S.D. Ala. 1981). "Settlement agreements are governed by the rules for interpretation of contracts." Mizner Grand Condo. Ass'n, Inc. v. Travelers Prop. Cas. Co. of Am., No. 09-82280-CIV, 2010 WL 2162902, at *3 (S.D. Fla. May 26, 2010). State law governs the interpretation of a settlement agreement. See Resnick v. Uccello Immobilien GMBH, Inc., 227 F.3d 1347, 1350 (11th Cir. 2000) ("even though this

settlement agreement arose under the ADA, state contract law directs our analysis here").

"A release when in writing must be given effect according to its plain terms." Hartford Acc. & Indem. Co. v. Cochran Plastering Co., 935 So. 2d 462, 471 (Ala. Civ. App. 2006) (citation and internal punctuation omitted).   "An agreement reached in settlement of litigation is as binding on the parties as any other contract."  Blount v. Blount, 159 So. 3d 737, 742 (Ala. Civ. App. 2013).  The Tisdales agreed to release all of their then-existing claims against the City.  (Doc. 2-9 at 2, ¶ 1.)  Accordingly, Court should dismiss all claims, except the Fourth Amendment claim and the breach of contract claim, based upon the doctrine of release.

### 10.    The Tisdales Waived the Right to Bring this Action in a Covenant Not to Sue and Limitation of Remedy Clause

The Tisdales waived the right to bring this action in a limitation of remedy clause.  (Doc. 2-9 at 8, ¶ 11.)  "Limitation of remedy clauses are enforceable unless they are unconscionable or against public policy," Danieli & C. Officine Meccaniche S.p.A. v. Morgan Constr. Co., 190 F. Supp. 2d 148, 155-56 (D. Mass. 2002), and "[a] covenant not to sue operates as a release," State v. Gulf Oil Corp, 256 So. 2d 179, 181 (Ala. 1971).

In the mediation settlement agreement's covenant not to sue and limitation of remedy clause, the Tisdales expressly covenanted not to sue in the event of future abatement action:

> *In the event the City takes any enforcement and/or abatement action against one or more of Plaintiffs' properties in the future,*

Plaintiffs agree that their sole avenue to contest such action, or to seek relief based on such action, shall lie within the procedures established by the statutes, code, or ordinance that defines the procedure for the action in question.   In other words, while Plaintiffs shall retain all rights of timely appeal provided by the particular statute, code, or ordinance that defines the procedure for the action in question, *Plaintiffs agree not to seek declaratory relief, injunctive relief, monetary damages, attorneys' fees, or costs in a separate legal action under any legal theory, or otherwise to pursue any collateral attack on the enforcement action.*   In the event one or more Plaintiffs breach this provision, Plaintiffs agree that the City shall be entitled to recover from Plaintiffs, jointly and severally, all attorneys' fees, costs, and expenses (including City personnel expenses) it incurs in responding to and defending the separate action and/or other collateral attack.

(Doc. 2-9 at 8, ¶ 11 (emphasis added).)   Based upon the Tisdales' explicit covenant not to sue and waiver of remedies, the Court should dismiss this action with prejudice or, in the alternative, grant summary judgment for the City.

### 11.   The Court Should Dismiss the Punitive Damages Claim Based Upon Immunity

In its prayer for relief on page 13, the Amended Complaint claims punitive damages from the City.  (Doc. 2 at 13.)  The City moves to dismiss the punitive damages claim because punitive damages are not recoverable from a municipality under 42 U.S.C. § 1983, see City of Newport v. Fact Concerts, Inc., 453. U.S. 247, 271 (1981), or under state law, see Ala. Code § 6-11-26 (1975).

### 12.   The Court Lacks Subject Matter Jurisdiction Over the Tisdales' Request for Injunctive Relief

This Court lacks subject matter jurisdiction over the Tisdales' request for injunctive relief.   As a threshold issue, the City cannot find a claim for injunctive relief anywhere in the Amended Complaint.   (Doc. 2.)

In any event, such a request is moot.   As building inspector Richard Moore explains in his declaration, the City had a deadline of October 1, 2017, to complete its remediation work and the City completed its work by that deadline.   (Doc. 22-1 at 13, ¶ 34.)

"A plaintiff must demonstrate three things to establish standing under Article III."   Shotz v. Cates, 256 F.3d 1077, 1081 (11th Cir. 2001).

> (1) injury in fact, by which we mean an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal relationship between the injury and the challenged conduct, by which we mean that the injury 'fairly can be traced to the challenged action of the defendant, and has not resulted from the independent action of some third party not before the court; and (3) a likelihood that the injury will be redressed by a favorable decision, by which we mean that the prospect of obtaining relief from the injury as a result of a favorable ruling is not too speculative.

Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 663-64, 113 S. Ct. 2297, 2301-02 (1993) (internal punctuation and citations omitted).   "This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence."   Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103-04, 118 S. Ct. 1003, 1017 (1998).

"The 'injury-in-fact' demanded by Article III requires an additional showing when injunctive relief is sought.  In addition to past injury, a plaintiff seeking injunctive relief 'must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future.'"  Houston v. Marod Supermarkets, Inc., 733 F.3d 1323, 1328-29 (11th Cir. 2013) (quoting Wooden v. Board of Regents of Univ. Sys. of Ga., 247 F.3d 1262, 1284 (11th Cir. 2001)). "Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party shows 'a real and immediate – as opposed to a merely conjectural or hypothetical – threat of future injury.'"  Houston v. Marod Supermarkets, Inc., 733 F.3d 1323, 1329 (11th Cir. 2013) (quoting Shotz v. Cates, 256 F.3d 1077, 1081 (11th Cir. 2001)).  "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects."  O'Shea v. Littleton, 414 U.S. 488, 495-96, 94 S. Ct. 669, 676 (1974).

"[A] prayer for injunctive and declaratory relief requires an assessment, *at this stage in the proceeding*, of whether the plaintiff has sufficiently shown a real and immediate threat of future harm."  Elend v. Basham, 471 F.3d 1199, 1207 (11th Cir. 2006) (emphasis added).  "The binding precedent in this circuit is clear that for an injury to suffice for prospective relief, it must be imminent."  Elend v. Basham, 471 F.3d 1199, 1207 (11th Cir. 2006).

Any claim for injunctive relief is moot.  See Beasley v. Alabama State Univ., 3 F. Supp. 2d 1325, 1344 (M.D. Ala. 1998) ("While Beasley had standing to pursue injunctive relief when she first filed suit, as well as when she first

moved to certify a plaintiff class in June 1996, because she still had several months of eligibility to participate in NCAA athletics at that time, her eligibility has now long expired.  Consequently, she can no longer benefit from an order requiring ASU to comply with the mandates of Title IX, and her claim for injunctive relief is now moot.").  The Tisdales cannot demonstrate the prospect of an imminent injury, because the City has completed its abatement of the properties.  (Doc. 22-1 at 13, ¶ 34.)  The Tisdales lack standing to obtain injunctive relief, and this Court lacks subject matter jurisdiction to grant it. See Dermer v. Miami-Dade Cnty., 599 F.3d 1217, 1220 (11th Cir. 2010) ("A court . . . lacks subject matter jurisdiction to hear a case if the requirements of Article III of the Constitution are not satisfied.").

## IV.  CONCLUSION

For all of these reasons, the Court should dismiss this action with prejudice or, in the alternative, grant summary judgment for the City.

## STATEMENT OF THE TISDALES' POSITION

Before filing this Motion, counsel for the City communicated with the Tisdales' attorney by telephone.  The Tisdales' attorney advised that he needs additional time to review this Motion before he decides whether or not to oppose it.

s/ James H. Pike
James H. Pike  (ASB-5168-P63J)
SHEALY, CRUM & PIKE, P.C.
P.O. Box 6346
Dothan, Alabama  36302-6346
Tel. (334) 677-3000
Fax (334) 677-0030
Email: jpike@scplaw.us

Attorney for Defendant
The City of Andalusia, Alabama

**CERTIFICATE OF SERVICE**

I, James H. Pike, certify that on October 11, 2017, I electronically served

this document, via the CM/ECF system, upon:

Christopher E Sanspree
SANSPREE LAW FIRM, P.C.
603 Martha Avenue
Montgomery, Alabama  36104

s/ James H. Pike
James H. Pike